UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE GENERAL CONVENTION OF THE NEW JERUSALEM IN THE UNITED STATES OF AMERICA, INC., THE MASSACHUSETTS ASSOCIATION OF THE NEW JERUSALEM (SWEDENBORGIAN), and GEORGE CHAPIN, <br><br> Plaintiffs, <br><br> v. <br><br> EDWARD MACKENZIE, THOMAS KENNEDY, BOSTON SOCIETY OF THE NEW JERUSALEM, INCORPORATED (SWEDENBORGIAN), and BOSTONVIEW CORPORATION, <br><br> Defendants. | C.A. No. 04 10419 WGY <br><br> MAGISTRATE JUDGE ___ <br><br> RECEIPT # 54208 <br> AMOUNT $ 150 <br> SUMMONS ISSUED ___ <br> LOCAL RULE 4.1 ___ <br> WAIVER FORM ___ <br> MCF ISSUED ___ <br> BY DPTY. CLK ___ <br> DATE 3/2/04 |

## COMPLAINT

### INTRODUCTION

1. Defendant, Edward ("Eddy") MacKenzie, a convicted felon and former enforcer for Whitey Bulger, and Thomas Kennedy, who allegedly engaged in fraudulent loan transactions, have utilized a pattern of racketeering activity to wrongfully take control of a one hundred eighty-five year old church to obtain dominion over its $30 million apartment house which now generates more than $1.2 million in annual income.

2. MacKenzie joined the Church in November, 2002. He teamed with Kennedy to obtain control over the Church's mentally-disabled minister. They then began to misappropriate money from the Church.

3. In February and May, 2003, they then forced the Church into admitting new "straw" church members, who would vote as MacKenzie and Kennedy directed. In May, 2003, MacKenzie and Kennedy utilized the votes of these new members and extorted the votes of other

# 1745161_v1

- 2 -

members to become elected as trustees of the Church. MacKenzie also became elected as Treasurer.

4. In September, 2003, when they believed their positions had become effective, they then used extortion and other means to become elected as directors of Bostonview Corporation, the company which is owned by the Church and which owns the $30 million apartment house. They also began to misappropriate more money from the Church for their personal benefit.

5. In October, 2003, MacKenzie and Kennedy then used extortion, mail fraud and other means to force the Church to disaffiliate itself from the Denomination. They did so to avoid the ramifications of an investigation which found that the minister, through his affiliation with MacKenzie and Kennedy, had not acted appropriately. After the disaffiliation, Kennedy and MacKenzie moved businesses in which they have an interest into the offices of the Church. They did so to utilize Church copiers, telephones and other equipment and to avoid the incurrence of similar expenses by their businesses.

6. MacKenzie and Kennedy are now preparing to convert the apartments into condominiums. They will profit personally through the sale of those assets. They also wrongfully continue to receive cash and other benefits from the Church.

7. MacKenzie's and Kennedy's actions constitute violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962. In furtherance of their scheme, they have breached the Church's by-laws, perpetrated extortion and mail fraud, breached fiduciary duties, engaged in common law fraud, and violated Mass. Gen. Laws ch. 93A.

8. The Church's by-laws also provide that the Denomination, Plaintiff, General Convention of the New Jerusalem in the United States of America, Inc., is entitled to hold the Church's assets in escrow based on the Church's recent disaffiliation from the Denomination.

## THE PARTIES

9. Plaintiff, The General Convention of the New Jerusalem in the United States of America, Inc. (the "Denomination"), is the denomination associated with churches that follow principles and teachings of Emanuel Swedenborg. Such principles include, without limitation, acting for the benefit of others. The Denomination's principal executive office is located in Newtonville, Massachusetts.

10. Plaintiff, The Massachusetts Association of the New Jerusalem (Swedenborgian) (the "Association"), is comprised of five active churches, which previously included the Church. The Association's principal executive office is located in Newton, Massachusetts.

11. Plaintiff, George Chapin, is a member of the Boston Society of the New Jerusalem, Inc. (Swedenborgian). He resides in Everett, Massachusetts.

12. Defendant, Edward ("Eddy") MacKenzie ("MacKenzie"), is an individual who, upon information and belief, resides in Boston, Massachusetts.

13. Defendant, Thomas Kennedy ("Kennedy"), is an individual who, upon information and belief, resides in Boston, Massachusetts.

14. Defendant, Boston Society of the New Jerusalem, Inc. (Swedenborgian) (now named Church of the Hill) (the "Church"), is a church located at 140 Bowdoin Street, Boston, Massachusetts.

15. Defendant, Bostonview Corporation ("Bostonview"), is a corporation which is located at, and owns the building located at 140 Bowdoin Street, Boston, Massachusetts. The building contains the Church Chapel, Church offices and approximately thirty (30) residential

apartments. The Church is the sole stockholder of Bostonview. The apartments' value exceeds $30 million. The apartments now generate more than $1.2 million in annual revenue to the Church.

## JURISDICTION AND VENUE

16. Jurisdiction over this matter exists pursuant to 18 U.S.C. § 1964.

17. Venue is appropriate pursuant to 18 U.S.C. § 1964(a), (b).

## THE ALLEGATIONS

18. Individuals who resided in and near Boston created the Church in 1818. The Church had become affiliated with the Denomination at or before the date of its creation.

19. Members of the Church are to follow the principles set forth by Emanuel Swedenborg. Such principles include, without limitation, dedicating ones life and resources toward the betterment of others, helping others to reach their full potential, and assisting one's neighbor. Swedenborgian churches work for the good of all.

20. These individuals and subsequent Members have maintained the Church and followed the Swedenborgian principles since its creation nearly one hundred eighty-five (185) years ago.

21. The Members attend chapel services, sponsor free ecumenical clergy breakfasts, offer free dinners, assist with the payment of college tuition of Members' children, and provide money and services for city relief projects. They also maintained an emergency relief fund which the Church accessed to assist needy people. They also engage in other charitable activities.

22. During its nearly 185-year existence, the Church has received the services of numerous Pastors. Such Pastors conduct all religious services and handle many administrative tasks of the Church.

23. The Church also has officers who include a President, Vice President, Secretary and Treasurer.

24. The Church also has a Board of Trustees. The Members of the Church elect the Trustees. The Trustees are ultimately responsible for decisions regarding the Church's finances, governing the action of the treasurer, the collection and distribution of all funds for the support of public worship or special programs, the maintenance of financial records, and the preparation of a budget.

25. The Church also has a Church Council. Its members include the Pastor, the President, Vice President, Secretary, Treasurer, Chair of the Board of Trustees and several at-large members. The duties of the Church Council address, without limitation, whether new members should be admitted to the Church.

### Reverend G. Steven Ellis Becomes Minister of the Church

26. In 1982, Reverend G. Steven Ellis ("Reverend Ellis") became Pastor of the Church. He had graduated from the New Church Theological School, the Denomination's post-graduate seminary, which is located in Newton, Massachusetts.

27. Reverend Ellis guided the Church in its religious activities. He also served on the local clergy council, maintained regular office hours to be available for counsel and advice, served on city service committees, held occasional Bible study sessions after church services, and did work for and with senior citizens within and without the congregation.

28. During the course of his ministry, however, Reverend Ellis began to suffer mental illness. Upon information and belief, he suffers as a manic depressive. He became mentally unstable.

29.     Reverend Ellis's behavior changed significantly because of his mental illness. At services he would cry. He became difficult to reach by telephone and otherwise. At services, his sermons oddly focused on issues relating only to himself and not on Swedenborgian principles. He frequently yelled and screamed. He no longer dedicated time toward certain charitable activities. He also left the Church for extended periods to visit his family in Kentucky.

### Thomas Kennedy Joins the Church

30.     Thomas Kennedy joined the Church just prior to May, 2002.

31.     Upon information and belief, Kennedy misrepresented his background to Reverend Ellis. He misrepresented that the MBTA had employed him as an accountant and that he had left this position. Upon information and belief, the MBTA had fired Kennedy. Upon information and belief, Kennedy had also engaged in fraudulent loan transactions.

32.     Kennedy observed Reverend Ellis's mental instability. He believed that this instability would permit him to take actions designed to exploit the relationship with Reverend Ellis. Accordingly, Kennedy befriended Reverend Ellis.

### Thomas Kennedy Joins But Then Leaves the Massachusetts New Church Union Because, Among Other Reasons, He Attempted to Transfer Union Funds to an Account From Which Only He Had the Power of Withdrawal

33.     To benefit personally and financially, Kennedy advised Reverend Ellis to nominate him as President of the Massachusetts New Church Union (the "Union"). The Union is a non-profit corporation which holds the properties and funds of the Association and responds to the request of the Association for money to conduct programs. The Association then included Swedenborgian congregations located in Cambridge, Yarmouthport, Bridgewater, Elmwood, Brockton, Newtonville and the Church, which is located in Boston. The Church left the Association in 2003.

34. The Union holds funds for the Association. It also owned a library located at 79 Newbury Street and a Blairhaven Retreat and Conference Center in South Duxbury, Massachusetts.

35. The Union has a General Secretary, who oversees the activities of the Union. The Union also has other officers, such as President, Treasurer and Clerk.

36. As Kennedy planned, in May, 2002, Reverend Ellis, then President of the Association, proposed at an annual meeting of the Association and Union that Kennedy should serve as President of the Union. Reverend Ellis spoke in strong support of Kennedy. The membership elected Kennedy as President of the Union.

37. After being elected as President, Kennedy attempted to use that position for his personal benefit. These actions demonstrate the nature of the activities that he would later take as to the Church and Bostonview.

38. Kennedy grossly abused his position as President. He made hundreds of personal long-distance telephone calls using the Union's telephone. A true and accurate copy of an invoice evidencing these calls is attached as Exhibit A. He also verbally and otherwise abused and belittled Union employees, some of whom had worked for the Association for more than twenty years.

39. In July or August, 2002, Kennedy tried to transfer more than $1 million in Union funds to a Wachovia account from which only Kennedy had the power of withdrawal. A true and accurate copy of the transfer application is attached as Exhibit B. No justification for that transfer existed. Kennedy made this transfer only to obtain personal access to the Union's funds.

40. The Bank resisted Kennedy's efforts concerning the transfer. It notified the Association. The Association found that Kennedy's attempt to transfer the funds was wrongful. The transfer did not occur.

41. Kennedy also conducted a meeting in September, 2002, only to discredit the General Secretary. Kennedy invited Alfred Nugent, the lawyer who defended MacKenzie as to his earlier crimes, to the meeting to indicate falsely that the General Secretary had been fiscally irresponsible and to suggest that he had embezzled funds. Kennedy believed that these statements would cause Union representatives to lose faith in the General Secretary.

42. Kennedy also misrepresented that a small group of Church Members had paid for Mr. Nugent's appearance when in fact Kennedy paid him with Union funds.

43. Thereafter, Kennedy obtained the assistance of MacKenzie in connection with actions he was taking at the Union.

44. MacKenzie and Kennedy moved into the Union facility at 79 Newbury Street.

45. Kennedy hired his children to do decorating and painting work at 79 Newbury Street. Upon information and belief, Kennedy used Union funds to pay them more than the value of the work they performed.

46. MacKenzie and Kennedy used Union funds to purchase furniture, computers and telephones for their own use.

47. They later utilized another $13,000 of Union funds to purchase equipment, which, upon information and belief, was also for their personal use.

48. By November and December, 2002, Union members had decided that they would no longer tolerate Kennedy's behavior. In December, 2002, they called a special Union membership meeting, scheduled for January 5, 2003 to hold new elections for the Officers and

Directors of the Union. The intent was to remove Kennedy as President of the Union, and to bring the Union Standing Committee back under the control of the full Union membership. Through negotiations, Kennedy resigned beforehand to avoid the need for him to disclose all the wrongful activities that he and MacKenzie had committed.

49. Following Kennedy's resignation, the Church paid the Union $14,000 to replace some of the funds expended without authorization by Kennedy and MacKenzie.

50. Although Kennedy resigned in December, 2003, MacKenzie and Kennedy refused to return the Union's checkbook until February or March, 2003.

### Edward MacKenzie Joins the Church

51. In or about November of December, 2002, MacKenzie and Kennedy agreed to take actions necessary to obtain control of the Church and its major physical asset, an apartment house worth approximately $30 million.

52. Kennedy introduced Reverend Ellis to MacKenzie. Kennedy did not disclose the nature of MacKenzie's past.

53. MacKenzie became a member of the Church in November, 2002. MacKenzie had fraudulently represented that he wished to become a member of the Church to follow the principles set forth by Emanuel Swedenborg. MacKenzie knew this statement to be false. In fact, MacKenzie stated during a July, 2003, televised promotion of his book "Street Soldier" in July, 2003 (a full eight (8) months after joining the Church) that he was, at that time, a Roman Catholic. This statement violates Article IV, Section 1(b) of the Church's by-laws which states that no Members of the Church shall retain active membership in any other church communion. A true and accurate copy of the by-laws is attached as Exhibit C.

54. MacKenzie had served as an enforcer for Whitey Bulger in the late 1980s. His published book, "Street Soldier," documents his criminal past.

55. MacKenzie's duties to Mr. Bulger included the use of brute physical force. For example, MacKenzie, a former Golden Gloves boxer, had broken individuals' arms and legs, bitten off an individual's finger and then ate it, and defecated in individuals' beds. He had also beaten people mercilessly. He also served as a drug dealer.

56. In or about 1990, MacKenzie had also been convicted of cocaine trafficking. He entered prison but later received immunity based on his agreement to assist in the apprehension of Columbian drug dealers.

57. MacKenzie's criminal activities continue. In 2001, he reportedly defrauded an elderly women. He indicated that he would locate her lost son. He reported the he located the son in a Cuban prison. That representation was false and MacKenzie knew it to be false at the time he made it. A true and accurate copy of an article concerning these activities is attached as Exhibit D.

58. Upon information and belief, in and before 2001, MacKenzie had also received more than $30,000 in worker's compensation payments based on a fabricated disability. Upon information and belief, he has been required to refund this amount. A true and accurate copy of an article concerning these activities is attached as Exhibit E.

59. MacKenzie also observed that Reverend Ellis was mentally unstable. Accordingly, he took actions to obtain control of Reverend Ellis. MacKenzie believed that such control would permit him and Kennedy to obtain dominion over the Church and its apartment house worth more than $30 million.

60. Because MacKenzie also did not work, he spent most of his time at the Church. He drove Reverend Ellis wherever he needed to go. He spent time at the Church assisting Reverend Ellis in connection with whatever tasks he needed completed. MacKenzie remained in

Reverend Ellis's presence. MacKenzie and Kennedy ate three meals a day with him. They helped Reverend Ellis make all of his decisions. As a result, MacKenzie's and Kennedy's plan succeeded. MacKenzie obtained control of Reverend Ellis.

61. As a result, MacKenzie and Kennedy also began to request and receive checks from Reverend Ellis from the Church's discretionary fund. Those funds existed only to support the charitable actions of the Church. Upon information and belief, Kennedy and MacKenzie received as much as $25,000 from the fund. No justification existed for these payments.

62. MacKenzie also forced the Church to pay the tuition of his daughter to attend a private secondary school. Previously, payments on behalf of Members' children had been made by the Church only as to reimbursement of college tuition. Payments as to secondary school had never been permitted.

63. MacKenzie used extortion to force the Board to approve the expenditure. At the vote concerning the payment of amounts regarding MacKenzie's daughter's attendance at a secondary school, he stood directly behind the Board Chairman. MacKenzie indicated that the expenditure should be approved. He took these actions only to create fear in the members of the Board. That fear caused the Board to approve the expenditure.

### New Individuals Attempt to Join the Church In Breach of Its By-Laws

64. Many actions of the Church require a majority vote of the Church members. Such actions include, without limitation, voting for individuals to become Trustees within the Church.

65. To assist in controlling a majority of the members, MacKenzie and Kennedy asked that their friends and numerous members of their families be admitted as Church Members. MacKenzie and Kennedy misrepresented to Reverend Ellis and the Board of Trustees that these individuals wished to join the Church to follow the Swedenborgian principles.

66. These new members had no intention of following the principles of the Swedenborgian faith. They possessed no interest in becoming members of the Church. MacKenzie and Kennedy caused these individuals to join only so MacKenzie and Kennedy could direct how they would vote.

67. In February and May, 2003, MacKenzie and Kennedy presented these individuals for admission into the Church. True and accurate copies of agendas concerning these votes are attached as Exhibits F & G.

68. MacKenzie and Kennedy used their control of Reverend Ellis to obtain his assistance in getting these new members admitted to the Church. Reverend Ellis repeated the fraudulent reasons why these members should be permitted to join the Church. He also recommended that these individuals join the Church. Based on these fraudulent misrepresentations, the Church allowed these individuals to join.

69. Moreover, the church admitted these individuals in breach of its own by-laws. Most, if not all, of the individuals recommended by MacKenzie and Kennedy for admission had never even visited the Church. Many also did not attend the meeting at which the church decided whether to admit them.

70. Never had potential new members failed to attend the meeting at which their membership would be decided. Potential new members also had never failed to visit or participate in Church-related activities before being admitted.

71. Article IV, Section 3 of the Church's by-laws also specifically specified that "[a]ll candidates for membership ... shall participate in sessions of doctrinal study leading toward confirmation under the guidance of the Pastor .... Confirmations must be recorded in the Church permanent records." A true and accurate copy of the by-laws is attached as Exhibit C.

72. The process of confirmation required Reverend Ellis to instruct each potential new member as to principles of the Swedenborgian faith. Only after that process is completed may the individual be considered for admission to the Church.

73. Reverend Ellis did not confirm any of the new members who the Church admitted at the requests of MacKenzie and Kennedy. Reverend Ellis, however, had confirmed all other Members of the Church who had previously joined during his ministry.

74. The ability to control votes of these newly-admitted members and the Church membership provided MacKenzie and Kennedy with dominion over the Church's greatest physical asset: the $30 million apartment complex which it owns. That complex now generates more than $1.2 million dollars in net revenue on an annual basis.

### MacKenzie and Kennedy Coerce the Church Into Electing Them As Officers and Trustees of the Church

75. As a result of gaining control of the Church Membership, MacKenzie and Kennedy then forced the Church to conduct votes concerning their election as Trustees and Officers of the Church. MacKenzie and Kennedy also sought the removal of current Trustees and Officers. Such Trustees included Bobby Buchanan and John Perry.

76. MacKenzie and Kennedy directed newly-admitted members, who were family and friends, how to vote. They voted as directed.

77. MacKenzie and Kennedy also extorted the votes of numerous elderly Members. MacKenzie and Kennedy did so by standing and walking through the crowd of elderly Members during the vote, which was by hand. Upon information and belief, these Members included, for example, Anna Brown, David Dorcey, Sandy Flaherty, Andrew McClaine, Ralph Schwartz, and others. MacKenzie and Kennedy again indicated to these Members that failing to vote in favor of their election and the removal of current Trustees or Officers would not be beneficial to them.

For example, and without limitation, MacKenzie indicated that these individuals would lose Church benefits if they did not vote as directed. MacKenzie and Kennedy intended that such actions would create fear in the elderly Members. As a result of this fear, these Members voted as directed.

78. During those votes, MacKenzie also wrongfully prevented individuals who supported the current Trustees from speaking. For example, one individual wished to make comments supporting the then present Trustees and officers. MacKenzie prevented him from doing so.

79. As a result, MacKenzie, Kennedy and others became elected as Trustees. Various existing members were replaced as Officers and/or Trustees. As a result of their election, MacKenzie and Kennedy then obtained control of the Board of Trustees.

80. MacKenzie also forced the members to vote to remove Joan Buchanan as Treasurer. MacKenzie sought to replace her. The newly elected members voted in favor of electing MacKenzie. MacKenzie and Kennedy also extorted the votes of the same elderly Members in the same fashion that they had previously used. The position as Treasurer provided MacKenzie with unfettered access to the Church's funds.

81. In June, 2003, MacKenzie and Kennedy instructed Reverend Ellis to tell Bob Buchanan to resign or that Big Brother would visit him. Reverend Ellis did so. MacKenzie and Kennedy caused this statement to occur to create fear in Mr. Buchanan. As a result of this fear, Mr. Buchanan no longer acted as President.

82. Upon information and belief, in July, 2003, MacKenzie and Kennedy stole financial records of the Church and three cancelled checks. They did so to prevent the disclosure of their wrongful acquisition of Church funds.

83. Any election of MacKenzie as Treasurer of the Church could not have become effective until September 1, 2003. On September 2, 2003, he and Kennedy appeared at the Church's bank, Mellon, to cash Church checks payable to each of them.

84. The Bank refused to cash the checks. A true and accurate copy of a letter from the Bank to that effect is attached as Exhibit H. Thereafter, however, MacKenzie and Kennedy obtained from the Church, which they then controlled, the amounts they sought from Mellon.

85. On September 21, 2003, MacKenzie and Kennedy conducted a meeting to expel Bobby and Joan Buchanan as Members of the Church. They did not notice the meeting appropriately. Accordingly, the results of the votes taken at the meeting are void. A true and accurate copy of a memorandum concerning the meeting is attached as Exhibit I.

86. MacKenzie moved at the meeting to expel Bobby and Joan Buchanan. He had instructed his and Kennedy's family and friends to vote in favor of the motion. He had also extorted the elderly Members into voting that way as well.

87. As directed by MacKenzie and Kennedy, the newly-admitted members voted to expel Joan and Bobby Buchanan, who had been Members of the Church more than thirty years. As a result of the fear created in the elderly Members, many also voted in favor of expulsion.

### MacKenzie and Kennedy Also Become Directors of Bostonview

88. At the September 21, 2003 meeting, MacKenzie and Kennedy obtained positions as directors of Bostonview by misrepresenting to the Membership that they would act for the benefit of the Church. They won this election by directing the new-admitted members how to vote and by extorting the votes of the same elderly Members in the manner they had utilized as to previous votes.

89. With the intent to further their scheme, they directed Edwards & Angell, LLP to forward a letter to the property's real estate manager evidencing the result of the election. This mailing constituted mail fraud in violation of 18 U.S.C. § 1341. A true and accurate copy of a letter from Edwards & Angell, LLP evidencing that fact is attached as Exhibit J.

90. Obtaining positions as directors of Bostonview enabled them to further control the $30 million apartment house and the expenditure of more than $1.2 million in net revenue earned by that corporation each year.

## The Church Leaves the Denomination

91. As a result of Reverend Ellis's behavior as to these elections and otherwise, some of the former Trustees had asked the Denomination in May, 2003 to conduct an investigation as to Reverend Ellis. The Denomination agreed to do so. A true and accurate copy of the request is attached as Exhibit K. The Denomination's President presented the former Trustees' request to its Committee on Inquiry. The Committee then began an investigation as to Reverend Ellis.

92. In accordance with the Committee's policies, Reverend Ellis was invited for an Interview. He asked if he could have supporters with him. The Committee is able to allow one or two supporters to be present, but the dialogue is only with the minister.

93. When the Committee met with Revered Ellis, MacKenzie and Kennedy were the primary spokesmen for him. They controlled Reverend Ellis's responses. MacKenzie and Kennedy acted in this way because they did not want Reverend Ellis to admit what had actually occurred at the Church.

94. After completing its investigation, in accordance with its duly authorized procedures, the Committee on Inquiry turned its findings over to the Council of Ministers' Board of Denomination for action. This Board offered Reverend Ellis three options: (1) he could be closely supervised for six months, (2) he could be suspended for one year, or (3) he could have his credentials as a Swedenborgian minister revoked.

95. MacKenzie and Kennedy could not accept any of these options. They controlled Reverend Ellis and needed him to help with their plan to obtain the Church's assets.

96. At or about this time, the Association Executive Committee also had passed a resolution stating its non-recognition of the Boston Church's expulsions from its membership. The Committee had also prepared and was about to pass a resolution stating its non-recognition of all of the new members that had been lately brought into the Church in contravention of its own by-laws. A true and accurate copy of the resolution is attached as Exhibit L.

97. In response to a letter received from the Association's Executive Committee concerning a request for information, MacKenzie and Kennedy directed Edwards & Angell, LLP to forward a response on September 29, 2003, to avoid the production of information by the Church. A true and accurate copy of the letter is attached as Exhibit M.

98. MacKenzie and Kennedy also directed Edwards & Angell, LLP to forward a second letter on September 29, 2003. That letter confirmed the removal of Robert and Joan Buchanan as members of the Association. A true and accurate copy of that letter is attached as Exhibit N. MacKenzie and Kennedy sent the letter in an attempt to comply with the language of the Association's resolution and to frustrate any investigation into their expulsion of Church members.

99. MacKenzie and Kennedy sent the letters on September 29, 2003, in furtherance of their fraudulent scheme to control the Church and its assets. The mailing of the letters constitutes mail fraud in violation of 18 U.S.C. § 1341.

100. Shortly thereafter, MacKenzie and Kennedy forced the Church to become disaffiliated with the Denomination. They misrepresented the reason for the vote. They did not disclose that affiliation would foil their plan to continue to control the Church and its apartment house. They also did not address Reverend Ellis's mental incapacity. Instead, they portrayed the vote as one needed to save Reverend Ellis from what they asserted were wrongful actions of the Denomination.

101. To obtain the vote, MacKenzie and Kennedy again directed and obtained the votes of the family and friends that they had fraudulently caused to become members. They also continued to extort the votes of elderly Members using the methods previously set forth above.

102. After 185 years of affiliation, the Membership voted in favor of disaffiliation.

103. In furtherance their scheme, MacKenzie and Kennedy also directed the Church to forward letters on October 26, 2003 to the Denomination and Association stating that the Church had disaffiliated itself from the Denomination. These actions constituted mail fraud in violation of 18 U.S.C. § 1341. True and accurate copies of those letters are attached as Exhibits O & P.

104. MacKenzie and Kennedy continue to control the operations of the Church.

### MacKenzie and Kennedy Fail to Amend the Church's By-Laws Prior to the Date of Disaffiliation from the Denomination

105. Prior to becoming disaffiliated from the Denomination, the Church had not amended its by-laws. They then provided:

> In the event that the religious body known as the Boston Society of the New Jerusalem, Inc. shall cease to exist, all funds and holdings shall be transferred to the General Convention of the New Jerusalem in the United States of America.

<u>These assets shall be held in escrow for the establishment of another General Convention of the New Jerusalem (Swedneborgian) Church</u> within the City of Boston, Massachusetts. After a period of twenty (20) years, should no such Church exist, the capital and income therefrom shall revert to the General Convention of the New Jerusalem (Swedenborgian) with any restrictions of uses which may have been voted by the Society members at the time of dissolution.

Ex. C, Article X, Section 3 (emphasis added).

106. Accordingly, as a result of the disaffiliation, all Church assets, including the $30 million apartment house, should have been transferred to the Denomination.

### MacKenzie, Kennedy and Others Now Operate Businesses From the Church Offices

107. Because of their control, MacKenzie and Kennedy have moved businesses in which they have an interest into the offices of the Church. These businesses are not affiliated with the Church.

108. Operating the business from the Church's offices simply permits MacKenzie and Kennedy to avoid the costs associated with the salary of a secretary, office expenses, telephone and fax charges and other costs. The move is intended only to serve the personal and financial benefit of MacKenzie and Kennedy.

109. MacKenzie and Kennedy have also caused John Doyle to join the Church. He is a real estate "broker" who, upon information and belief, had previously worked for Whitey Bulger. Upon information and belief, he will assist MacKenzie and Kennedy in connection with the sale of the apartments as condominiums.

110. MacKenzie and Kennedy continue to receive wrongful payments from the Church.

## COUNT I
## (RICO 18 U.S.C. § 1962(b); Against MacKenzie and Kennedy)

111. Plaintiffs restate and incorporate by reference the allegations of Paragraphs 1 through 110 as if fully set forth herein.

112. This count is brought by Plaintiff, George Chapin, on behalf of himself, the Church, Bostonview, and all other persons similarly situated, as a member of the Church and beneficial holder of stock in Bostonview.

113. Plaintiff, George Chapin, fairly and adequately represents, respectively, the interests of the members and shareholders of the Church and Bostonview similarly situated in enforcing the rights of the corporations at issue in this case.

114. Plaintiff, George Chapin, has made no effort to secure action from, respectively, the trustees and directors of the Church and Bostonview corporations for the reason that MacKenzie and Kennedy herein control the majority of the trustees and directors of both boards through tactics of extortion and coercion. As such, the majority of the trustees and directors on the boards of the Church and Bostonview are interested parties. Thus, any demand on the boards that they bring an action in the name of the Church or Bostonview would have been futile.

115. The Plaintiffs further allege as follows:

116. MacKenzie and Kennedy are persons who knowingly or recklessly acted through a pattern of racketeering activity to obtain control of the Church, which is an enterprise.

117. The pattern of racketeering activity includes, without limitation, MacKenzie's and Kennedy's use of extortion to obtain the votes of elderly Church Members in or about May, 2003 and September, 2003 and as to their election as Trustees of the Church, Directors of Bostonview, and Officers of the Church.