UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

THE GENERAL CONVENTION OF THE NEW
JERUSALEM IN THE UNITED STATES OF
AMERICA, INC., THE MASSACHUSETTS
ASSOCIATION OF THE NEW JERUSALEM
(SWEDENBORGIAN), and GEORGE CHAPIN,

C.A. No. 04 10419 WGY

Plaintiffs,

v.

EDWARD MACKENZIE, THOMAS KENNEDY,
BOSTON SOCIETY OF THE NEW JERUSALEM,
INCORPORATED (SWEDENBORGIAN), and
BOSTONVIEW CORPORATION,

Defendants.

## PLAINTIFFS' OPPOSITION TO DEFENDANTS', EDWARD MACKENZIE'S AND THOMAS KENNEDY'S, MOTION TO DISMISS

The Plaintiffs, The General Convention of the New Jerusalem in the United States of America, Inc. (the "Denomination"), The Massachusetts Association of the New Jerusalem (Swedenborgian) (the "Association") and George Chapin ("Chapin") (collectively, the "Plaintiffs"), oppose the Defendants', Edward MacKenzie's and Thomas Kennedy's (collectively, the "Defendants") motion to dismiss. Briefly stated, the Defendants' motion should be denied.

Plaintiffs have standing under 18 U.S.C. § 1964(c). They have alleged injury resulting from MacKenzie's and Kennedy's action. Such injury includes, without limitation, the misappropriation of Church assets. Plaintiffs have sufficiently plead the predicate acts of extortion and mail fraud. They have also alleged a pattern of racketeering activity which includes past and future actions associated with gaining and maintaining control of the Church and Bostonview and past and future actions concerning the misappropriation of Church assets.

# INTRODUCTION

MacKenzie is a con man and a convicted cocaine trafficker. He also acted as a physically brutal enforcer for Whitey Bulger. In a July, 2003 videotaped interview, MacKenzie stated that he lacks any remorse for his criminal activities, which include, for example, savage beatings, severing and eating an individual's finger and trafficking drugs. He also stated that he still maintains the demonic and criminal character which permitted him to carry out his actions concerning the church.[1]

MacKenzie's actions have been extreme. In fact, his former wife has claimed that during the period where he allegedly acted as a "leader" of the Church, MacKenzie threatened to kill her. See Ex. A. Such activity is clearly inconsistent with any alleged interest in the real teaching of the Church. MacKenzie has infiltrated the Church only to misappropriate its resources for his own personal benefit.

He has done so by using extortion and mail fraud to obtain control of the votes of a majority of Church members. Such votes are needed to carry out many Church actions. He has used similar actions to cause himself and others friendly to him to be elected as officers and trustees of the Church and directors of its wholly-owned company, Bostonview, which owns the $30 million apartment house. Such actions have also permitted him to control the Church and to misappropriate Church funds. He has also caused the Church to disaffiliate itself from the Denomination only after it sought to remove or closely monitor the Church's pastor, whom MacKenzie needs to further his plan.[2]

---

[1] The Plaintiffs will produce this video to the Court if he or she desires.
[2] The Church created Bostonview in 1963 when it purchased the apartment house. The apartment house is located at 140 Bowdoin Street, Boston, Massachusetts. It contains more than thirty apartments. The Church and its offices are located on the first floor of the apartment house.

## FACTS

Since its creation in 1818, the Church has been affiliated with the Denomination.[3] Complaint, ¶¶ 18, 20.[4] With the assistance of the Denomination, Reverend G. Steven Ellis ("Reverend Ellis") became the Church's Pastor in 1982. He had graduated from the Denomination's post-graduate seminary. As Pastor, he coordinated the religious activities of the Church. Complaint, ¶ 26.

During his pastorship, Reverend Ellis's behavior changed considerably and detrimentally. He became, apparently, a manic depressive. As a result, he became detached and difficult to reach by telephone and otherwise. His sermons oddly focused on issues relating only to himself and not on Swedenborgian principles. He frequently yelled and screamed. He no longer dedicated time toward certain charitable activities. Complaint, ¶ 28-29.

In 2002, Thomas Kennedy, a new Church member with an unfavorable and apparently undisclosed background, observed the mental instability of Reverend Ellis.[5] Kennedy befriended Reverend Ellis only to later take advantage of him. After befriending Reverend Ellis, Kennedy asked that he become president of the Massachusetts New Church Union (the "Union"). The Union is a non-profit corporation which holds the assets of the Massachusetts Association of the New Jerusalem (Swedenborgian) (the "Association"). Those assets included more than $1 million in cash and two properties located at 79 Newbury Street, Boston, Massachusetts, and

---

[3] Throughout its history, the Church has obtained a variety of benefits from the Denomination such as financial assistance for ministerial salary when needed; itinerant ministerial services when the Church was without a resident pastor; teaching aids and methodologies for child and adult religious education programs; involvement in denominational youth programs; funding for projects of outreach and publication; retirement benefit(s) for minister(s) in the Church's employ; regular communication and information from the network of the Denomination's societies and centers in North America; and voting privileges in the ongoing work of the Denomination. It has used the services of the Denomination to obtain ministers; to obtain the services of trained consultants in the areas of stewardship, board training and process, and outreach programs; and it has relied on Denominational services to assist in establishing interim pastoral positions as needed. Complaint, ¶ 9.
[4] The Church's stated purpose is to establish and maintain public worship of the Lord Jesus Christ according to His Holy Word and the teaching of the Church which He has revealed in the theological writings of Emanuel Swedenborg. Complaint, ¶ 19.
[5] Kennedy has a history of unfavorable, if not criminal, behavior. Upon information and belief, Kennedy had engaged in fraudulent loan transactions. He also no longer maintained his job in the area of finance at the MBTA. Complaint, ¶ 31.

in Duxbury, Massachusetts.[6]  As President, Kennedy believed that he could siphon assets from

that entity.  Complaint, ¶¶ 32-36.

Reverend Ellis, through his position in the Association, had Kennedy elected President of

the Union.  Kennedy then utilized that position only for his own personal financial benefit.

Without authorization or justification, he attempted to transfer approximately $1 million in

Union funds to an account over which only he had the power of withdrawal.  Complaint, ¶ 39.

See Ex. B.  The Union prevented the transfer.  Complaint, ¶ 40.

Most important is that during his time as President, Kennedy recruited Edward

MacKenzie to assist in dissipating the assets of the Union.  MacKenzie was an enforcer for

Whitey Bulger in the 1980s.  He was convicted and has served time in prison for trafficking

cocaine.  MacKenzie has detailed his criminal behavior in a recently published book, "Street

Soldier."  At an engagement concerning the book, MacKenzie stated that his demonic and

criminal personality would never change.  He stated that he has never felt any remorse for his

criminal activities, which included savage beatings, eating an individual's finger and other

violent activities.  Complaint, ¶¶ 52-58.

MacKenzie's fraud continues.  For example, he reportedly swindled an elderly woman

out of more than $20,000 in 2001 by claiming that he would locate her son who had disappeared.

Complaint, ¶ 57, Ex. D.[7]  He also reportedly received more than $30,000 in fraudulent workers'

compensation payments in 2001 based on a fabricated disability.  Complaint, ¶ 58, Ex. E.

MacKenzie's participation accelerated the misappropriation of Union assets.  MacKenzie

and Kennedy moved into the Union's property at 79 Newbury Street.  They used Union funds to

purchase furniture, computers and telephones for their personal use.  Kennedy hired his children

to perform a totally unsatisfactory painting job.  They also misappropriated as much as $14,000

---

[6] The Association consisted of six churches, which then included the Church. Complaint, ¶ 10.
[7] A recent news article suggests that MacKenzie may have swindled her out of more than $100,000.  See Ex. A.

from the Union.  Complaint, ¶¶ 43-47.  Kennedy had also made hundreds of personal long-distance telephone calls at the Union's expense.  Complaint, ¶ 38, Ex. A.

The Union learned of MacKenzie's and Kennedy's activities.  It then scheduled a meeting in which it would disclose Kennedy's activities and then dismiss him.  Kennedy resigned to avoid the public disclosure of his misdealings during his term as President.  Complaint, ¶¶ 48-49.

### MacKenzie and Kennedy Take Actions Needed To Control The Church And Its $30 Million Apartment House and to Misappropriate Church Assets

In or about November and December, 2002, MacKenzie and Kennedy also began to focus their attention on the Church.  MacKenzie, who also recognized Reverend Ellis's mental instability, undertook efforts to befriend and then control him.  Complaint, ¶¶ 59-60.

After obtaining Reverend Ellis's trust, MacKenzie then carried out his fraudulent takeover of the Church.  Initially, he intimidated members of the Church's Board of Trustees and the Church Council.[8]  For example, he forced the Trustees to fund tuition associated with MacKenzie's daughter's attendance at a private secondary school.  Never had such an expenditure been approved.  Only college tuition had been reimbursed.  MacKenzie obtained the funding by standing directly behind the Chairman of the Trustees at the time of the vote and indicating that the tuition should be approved.  MacKenzie and Kennedy also caused Reverend Ellis to pay them as much as $25,000 from the Church's relief fund.  Such a practice had never occurred in the past.  Complaint, ¶¶ 61-63.

Through the above and other activities, MacKenzie quickly communicated that he is a person with whom people should not disagree.  He used this fear and intimidation to coerce the

---

[8] The Church's Board of Trustees manages the financial and other activities of the Church.  The Church Council controls membership and other activities.  Members of both bodies are comprised of Church members.  Complaint, ¶¶ 24-25, 53, Ex. C, Art. IX.

Trustees and the Church Council to approve certain items never before approved. MacKenzie's control of Reverend Ellis prevented any objection by him. Complaint, ¶¶ 65-69.

One such item concerned the admission of new Church members. The Church requires votes from a majority of the membership to approve various actions. To obtain control over a majority of members, MacKenzie and Kennedy sought to admit as Church members family members and friends. Many of these individuals had never even visited the Church. They had never been confirmed into the Swedenborgian faith as is required by the Church's by-laws. Complaint, ¶¶ 64-74. See also Ex. C, Art. IV, Sec. 3. Many did not even attend the meeting in which MacKenzie sought to have them elected as Church members. They had no interest in the Church. Despite the foregoing, MacKenzie used fear and intimidation to force the Church Council and the Church Membership to admit these individuals as members. After their admission, he then controlled a majority of the voting members. Complaint, ¶¶ 64-66, 74.

MacKenzie then used that majority vote to obtain control of the Church's Board of Trustees. At an annual May meeting of Church members, MacKenzie proposed that he and others be elected as Trustees in place of those nominated by the Nominating Committee, who included Robert Buchanan, Joan Buchanan and John Perry. MacKenzie used his control over new members and extortion to fix the outcome of the votes at the May, 2003, meeting. Complaint, ¶¶ 75-79.

He instructed his and Kennedy's family members and friends how to vote. He caused Reverend Ellis to distribute and endorse an alternate slate of officers, knowing that many of the members would not want to vote against Reverend Ellis's position. They voted as directed. He prevented individuals from speaking in opposition to his nominees. He also extorted the votes of elderly members of the Church. He indicated that not voting in favor of each item would cause

them to lose benefits from the Church or would otherwise be detrimental to them.  Many of these individuals also voted in favor of electing MacKenzie, Kennedy and others.  In doing so, they voted to abandon Robert Buchanan, Joan Buchanan and John Perry who had served as Trustees for numerous years.  Complaint, ¶¶ 75-80.  The Members also voted in favor of electing MacKenzie, a convicted felon, as Treasurer.  Complaint, ¶ 80.

The positions as Trustee and Treasurer could not become effective until September 1, 2003.  Not surprisingly, on September 2, 2003, MacKenzie and Kennedy approached the Church's Bank seeking payment of $10,000 in checks payable to them.  Because the Bank did not understand that MacKenzie acted as Treasurer, it refused to cash the checks.  Complaint, ¶ 83.  MacKenzie and Kennedy later obtained payment of $10,000 from the Church.  No justification existed for the payment.  Complaint, ¶ 84, Ex. H.

MacKenzie scheduled another meeting to be held on September 21, 2003, as to voting for the directors of Bostonview, the entity which owned the apartment house.  He again arranged for his and Kennedy's family members and friends to vote for the removal of existing Directors and the appointment of MacKenzie, Kennedy and others as new directors.  He extorted the votes of elderly members as well.  Complaint, ¶¶ 84-88.  In furtherance of their plan, MacKenzie and Kennedy caused Edwards & Angell, LLP to forward a letter to the property manager on September 23, 2003, setting forth the members of the board of directors.  Complaint, ¶ 89, Ex. J.

### The Denomination Investigates Reverend Ellis

As a result of MacKenzie's actions up to May, 2003, several Church Members asked the Denomination to conduct an investigation as to the practices of Reverend Ellis.  Complaint, ¶ 91, Ex. K.  At the Denomination's interview of Reverend Ellis, MacKenzie and Kennedy acted as his spokesmen.  They limited his responses and controlled the interview.  Complaint, ¶¶ 92-93.

After completion of the investigation, and, upon information and belief, the review of all activities occurring after May, 2003, the Denomination presented Reverend Ellis with three options: (1) he could be closely supervised for six months; (2) he could be suspended for one year; or (3) he could have his credentials as a Swedenborgian minister revoked. MacKenzie could not accept any of the options as to Reverend Ellis. To do so would require him to lose control of Reverend Ellis, whom he needed to maintain his control of the Church. Complaint, ¶¶ 94-95.

At or about this time, the Association's Executive Committee also failed to recognize the expulsion of members by MacKenzie's Church. Complaint, ¶ 96, Ex. L. The Association also intended not to recognize newly-admitted members to the Church. Those actions would also be difficult for MacKenzie and Kennedy to manage. He and Kennedy needed these votes to control the majority vote of the Membership. They did not need an investigation as to whether the memberships were valid, which they were not. Accordingly, MacKenzie and Kennedy directed Edwards & Angell, LLP to send two letters to the Association in an attempt to frustrate their resolution. Complaint, ¶¶ 97-98, Exs. M & N. The first letter attempted to avoid the production of information. Complaint, ¶ 97, Ex. M. The second letter attempted to follow the language of the resolution in an effort to avoid an investigation as to the expulsion of members. Complaint, ¶ 98, Ex. N.

## The Church Disaffiliates Itself From the Denomination

Fearing that the Denomination's order would become effective, MacKenzie and Kennedy forced the Church Membership to vote in favor of disaffiliation from the Denomination. MacKenzie's and Kennedy's family members and friends voted as directed. MacKenzie and Kennedy then misrepresented to the remaining members the reason for the vote. They did not disclose that continued affiliation with the Denomination would foil their plan to continue to

control the Church and its apartment house. They also did not address Reverend Ellis's mental incapacity. Instead, they portrayed the vote as one needed to save Reverend Ellis from what they asserted were wrongful actions of the Denomination. Many of the remaining Church members then voted in favor of disaffiliation. Complaint, ¶¶ 101-102. By letters dated October 26, 2003, to the Denomination and the Association, MacKenzie and Kennedy furthered their fraudulent scheme by causing the Church to communicate its disassociation to the Denomination and the Association. Complaint, ¶ 103, Exs. O & P.

**MacKenzie and Kennedy Now**
**Operate Businesses From Church Offices**

Since obtaining control of the Church, MacKenzie and Kennedy have moved businesses in which they have an interest into the offices of the Church. These businesses are not affiliated with the Church. Operating the businesses from the Church's offices simply permits MacKenzie and Kennedy to avoid the costs associated with the salary of a secretary, office expenses, telephone and fax charges and other expenses that they would otherwise incur operating the businesses from other locations. Complaint, ¶¶ 107-110. MacKenzie and Kennedy continue to operate those businesses.

MacKenzie and Kennedy have also caused John Burke to join the Church. He is a real estate "broker" who, upon information and belief, had previously worked for Whitey Bulger. He will assist MacKenzie and Kennedy in connection with the sale of the apartments as condominiums. Complaint, ¶ 109.

**ARGUMENT**

A.    **Motion to Dismiss Standard.**

A motion to dismiss for failure to state a claim is viewed with disfavor and rarely granted. Lowrey v. Texas A&M Univ. Sys., 117 F.3d 242, 247 (5th Cir. 1997). A district court

cannot properly dismiss a complaint for failure to state a claim unless it is clear the plaintiff cannot recover on any viable theory. <u>Carrea-Martinez v. Arrillaga-Belendez</u>, 903 F.2d 49, 53 (1st Cir. 2000). A 12(b)(6) motion should be denied unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim which entitles plaintiff to relief. <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957). In considering a motion to dismiss, the district court must accept all well pleaded facts as true and draw all reasonable inferences in favor of the plaintiff. <u>Soto-Negron v. Taber Partners I</u>, 339 F.3d 35, 36 (1st Cir. 2003); <u>LaChappelle v. Berkshire Life Ins. Co.</u>, 142 F.3d 507, 508 (1st Cir. 1998).

**B.      The Plaintiffs Have Standing Because They Have Alleged Injury To Business or Property Caused By The Defendants' Racketeering Activity.**

To have standing under 18 U.S.C. § 1964(c) a plaintiff must allege that the plaintiff is a person who has suffered injury to his or her property or business caused by the defendant's violation of 18 U.S.C. § 1962. 18 U.S.C. § 1964(c); <u>Price v. Pinnacle Brands</u>, 138 F.3d 602, 606 (5th Cir. 1998) (concluding that RICO plaintiff must allege injury and causation to have standing). The misappropriation of the funds and assets of the Church and Bostonview constitute injury to property and business. See <u>Pappas v. Passias</u>, 887 F. Supp. 465, 473 (E.D.N.Y. 1995) (recognizing that misappropriation of church funds is an injury to business or property under 18 U.S.C. § 1964(c) and would be actionable as a derivative claim).

Plaintiffs must also allege that a defendant's racketeering activity played a role in causing the plaintiff's injury. <u>Sedima S.P.R.L. v. Imrex Company, Inc.</u>, 473 U.S. 479, 496 (1985). The standard is whether the defendant's conduct of the RICO enterprise, i.e., his or her pattern of racketeering activity, caused injury to the plaintiff's business or property. <u>Sedima</u>, 473 U.S. at 495. Proximate cause is satisfied if the pattern of racketeering activity is a "substantial factor" in

causing the plaintiff's injury if the injury is reasonably foreseeable. <u>Hecht v. Commerce</u>

<u>Clearing House, Inc.</u>, 897 F.2d 21, 24 (2d Cir. 1990).

The Defendants argue that the Plaintiffs lack civil RICO standing under 18 U.S.C.

§ 1964(c) because they have not alleged any such injury. The Defendants wrongly contend that

Plaintiffs' only injuries are damages relating to the future conversion and sale of the apartment

building. Plaintiffs, however, have specifically alleged that they, the Church and Bostonview

have already suffered financial losses caused by the Defendants' commission of predicate acts

which has resulted in the misappropriation and misuse of Church and Bostonview funds and

assets.

The Plaintiffs allege that the Defendants have "utilized a pattern of racketeering activity

to wrongfully take control" of the Church. The Defendants have infiltrated Church leadership

and have taken control of the Church's assets to enable them to siphon off its funds and assets for

their benefit. To obtain the positions needed to misappropriate Church assets, the Defendants

have engaged in extortion to obtain the votes of the elderly Church membership. MacKenzie and

Kennedy have also engaged in extortion and mail fraud in furtherance of their scheme to

continue misappropriation of the Church's and Bostonview's assets.

By virtue of their control over the Church, MacKenzie and Kennedy have taken, and

continue to take, wrongful payments from the Church to the present. Complaint, ¶ 110. They

have taken as much as $25,000 from the Church's discretionary fund. Complaint, ¶ 61.

MacKenzie used extortion to force the Board of the Church to approve the payment of private

secondary school tuition for his daughter when the Church's longstanding policy had been to

only pay for members' children's college tuition. Complaint, ¶¶ 61-63. Because of Kennedy's

abuse of his Union President position, he and MacKenzie forced the Church to pay to the Union

$14,000 which they wrongfully took while acting for the Union. ¶¶ 36-49. As a result of becoming Church trustees MacKenzie and Kenedy have also taken unjustified payments of $10,000. Complaint, ¶ 83. MacKenzie and Kennedy have used and continue to use the Church's facilities, office space and resources to operate their personal businesses which are not affiliated with the Church or Bostonview. Complaint, ¶¶ 107-08. These allegations of financial loss to the Church and Bostonview caused by the Defendants' pattern of racketeering activity are sufficient to provide Plaintiffs with standing to pursue their RICO claims.[9]

### C.    The Complaint Sufficiently Alleges Extortion and Mail Fraud.

#### 1.    Extortion.

The Plaintiffs have properly pled predicate acts of extortion. The Hobbs Act, 18 U.S.C. § 1951, defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear." 18 U.S.C. § 1951. The "range of property rights protected by the Hobbs Act is sweeping in breadth." CIVIL RICO, A Definitive Guide, Gregory Joseph, ABA Publishing, p. 99 (2d ed. 2000). Property under the Hobbs Act includes intangible rights such as the right to conduct business free from outside pressure. United States v. Tropiano, 418 F.2d 1069, 1075-76 (2d Cir. 1969), cert. den., 411 U.S. 951 (1970) (right to solicit business free from territorial restrictions is "property" under Hobbs Act); United States v. Santoni, 585 F.2d 667, 673 (4th Cir. 1978) (recognizing a right to make business decisions free from outside pressure). Federal courts specifically recognize that the intangible right of union members to participate in union votes is "property" for purposes of the Hobbs Act. United States v. Debs, 949 F.2d 199, 201 (6th Cir. 1991)(denying defendant's motion to dismiss

---

[9] The Plaintiffs allege that the Defendants' criminal scheme involved incrementally taking greater control over the Church by means of extortion and mail fraud. The Defendants succeeded in assuming control over the Church as part of their plan to misappropriate Church assets. Accordingly, the Defendants' pattern of racketeering activity gave them the ability to misappropriate Church assets, which the Defendants did and continue to do. The Defendants' control of the RICO enterprise through their predicate acts of extortion and mail fraud, has caused and continues to cause loss of the Church's assets, and thus injury to the "property" of the Plaintiffs.

indictment for extortion and rejecting defendant's argument that right to participate in union votes is not "property" under the Hobbs Act); United States v. Bellomo, 176 F.3d 580, 592-530 (2d Cir. 1999)(affirming conviction of extortion of defendant who participated in a scheme to control a union by threat of violence).

These cases above apply with equal force to the votes by members of Bostonview and the Church that were extorted by the Defendants. Each member of the Church and each holder of a beneficial interest in Bostonview, including Mr. Chapin, has the right to participate in governance of those entities free from outside threats and pressure. By placing members in fear, the Defendants took this property from the members. Just as the members possess the right to participate in Church governance by voting, the Church and Bostonview enjoy the right to be governed legitimately, free from threats of violence. The Defendants obtained property of the Church and Bostonview by interfering in their right to be governed legitimately and to be free of criminal conduct.

The Church and Bostonview have also pled extortion because placing members in fear enabled the Defendant to gain control over the Church. Complaint, ¶¶ 117, 127, 137. Through that control the Defendants were able to wrongfully obtain the Church's assets, i.e., its property. In addition, Defendants used extortion to misappropriate Church assets. For example, MacKenzie committed extortion to obtain the funding of expenses relating to his daughter's secondary school tuition. Complaint, ¶¶ 61-63.

Without citation to any authority, the Defendants also argue that Plaintiffs cannot prove extortion because the acts of the Defendants at worst constitute ordinary "politicking" and, as a matter of law, not the use of actual or threatened force, violence, or fear. Motion, pp. 11-12. The issue of whether Church members as victims were placed in fear from the threatening acts of

the Defendants is a jury question and cannot be decided on a motion to dismiss.  See United States v. Goodoak, 836 F.2d 708, 710-12 (1st Cir. 1988) (upholding conviction and affirming use of victim's state of mind testimony in trial of defendant for attempted extortion because government must show generation of fear by alleged threats).  Furthermore, in alleging predicate acts, a civil RICO plaintiff need not be the victim of the predicate act of extortion so long as the plaintiff is injured by the defendant's acts.  See Northeast Women's Center, Inc. v. McMonagle, 670 F. Supp. 1300, 1307 (E.D. Pa 1987), aff'd in part, rev'd in part, 868 F.3d 1342 (3d Cir. 1989) (plaintiff's customers were the victims of the defendants' threats and the plaintiff proved that its business was injured by defendants' extortionate acts, which is sufficient under RICO).

The Defendants' characterization of their actions is contradicted by allegations in the Complaint.  Plaintiffs allege that Defendants placed Church members in fear in connection with extorting votes and misappropriating Church assets.  Complaint, ¶¶ 77, 86.  For example, and without limitation, the Plaintiffs have alleged that at a Church Board meeting to approve the payment of MacKenzie's daughter's private school education, MacKenzie stood directly behind the Church's Board Chairman and indicated that the vote should be approved, placing fear in the members of Board and inducing them to vote as directed.   Complaint, ¶ 61.  In an election of the Defendants for trustee positions, the Defendants extorted the votes of elderly Church members by "standing and walking through the crowd of elderly Members during the vote, which was by hand. . . . MacKenzie and Kennedy again indicated to these Members that failing to vote in favor of their election and the removal of current Trustees or Officers wound not be beneficial to them." "MacKenzie and Kennedy intended that such actions would create fear in the elderly members.   As a result of this fear, the Members voted as directed." Complaint, ¶ 77.  Accordingly, the Plaintiffs have sufficiently pled predicate acts of extortion.

## 2.    Mail Fraud.

The Plaintiffs have adequately alleged five predicate acts of mail fraud.   In their Motion,

the Defendants properly state the elements of mail fraud as 1) a scheme to defraud; 2) knowing

participation with the intent to defraud; and 3) mailing sent in furtherance of the scheme.   United

States v. Cassiere, 4 F.3d 1006, 1011 (1st Cir. 1993).   Importantly, the Defendants do not argue

that Plaintiffs have not alleged facts to establish the first two elements.   Motion, p. 13.

The Defendants only claim that the Plaintiffs have not alleged that the letters were mailed

in furtherance of a fraudulent scheme.   The Defendants' claim is misplaced.   The mailings aided

the Defendants in carrying out their scheme, which is all that is required under 18 U.S.C. § 1341.

United States v. Maze, 414 U.S. 395, 402-03 (1973) (mailings must contribute in some measure

to the scheme's success in obtaining desired object or avoiding or delaying detection); Perreira v.

United States, 347 U.S. 1, 8 (1954)(the mailings need not be an essential element of the scheme

to be in furtherance of a scheme).[10]

The Defendants' scheme included efforts to incrementally increase their control over their

RICO enterprise until the Defendants were in a position of complete control over the Church--as

they are now.   The scheme was fraudulent because the Defendants intentionally misrepresented

to Church members and leaders that their acts were conducted for the best interests of the

Church, when in fact, the Defendants' acts were conducted to benefit themselves only and to

injure the Plaintiffs and the Church members.   The Defendants caused the forwarding of  five

letters (Complaint, ¶¶ 89, 97, 98, 103 Exs. J, M, N, O & P) to further their fraudulent scheme.[11]

---

[10] Defendants' argument that the letters from Edwards & Angell, LLP cannot constitute mail fraud is unavailing.  In the cases on which they rely, the courts considered letters from attorneys in arms-length representations of clients in pending litigation in which the attorneys were setting out the client's legal position.  Those cases are inapposite because the letters here were mailed prior to litigation and were sent at the request of the Defendants in an attempt to ratify their illegal acts and to further their scheme to control the Church and its assets.

[11] They forwarded a September 23, 2003 letter to the Apartment House's management company setting forth that the Defendants and others now acted as directors of Bostonview.  Complaint, ¶ 89, Ex. J.  This letter furthered their

**D.**     **The Plaintiffs Have Alleged A Pattern Of Racketeering Activity.**

The RICO statute requires a plaintiff to allege only two predicate acts of racketeering activity to plead a "pattern of racketeering activity." 18 U.S.C. § 1961(5) (2004). Section 1961(5) defines racketeering activity as the commission of certain enumerated federal crimes, including mail fraud (18 U.S.C. § 1341) and extortion (18 U.S.C. § 1951). 18 U.S.C. § 1961(5) (2004). The Plaintiffs allege more than two predicate acts of mail fraud and extortion. See supra pp. 5-9. Thus, they have satisfied the statutory requirements.

In addition to the statutory requirements of pleading at least two predicate acts, the Supreme Court has held that the plaintiff must demonstrate that the predicate acts are related and that "they amount to or pose a threat of continued criminal activity"—the so-called 'continuity plus relationship requirement'. H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239 (1989). The allegations satisfy the "continuity plus relationship requirement" because the Defendants' racketeering activities are likely to continue indefinitely and their predicate acts are related.

**1.**     **The Defendants' Predicate Acts Are "Related."**

Relatedness is not a "cumbersome" test and can be proved by showing that the predicate acts "have the same or similar purposes, results, participants, victims or methods of commission." H.J. Inc., 223 F.3d at 240. The Defendants do not, and cannot, claim that the Defendants' predicate acts are not related. The Defendants engaged in a continued effort of

---

scheme by indicating that they should be contacted regarding the apartment house. In an effort to oppose the Denomination's investigation of Reverend Ellis, the Defendants ordered Edwards & Angell LLP to forward a letter indicating that the Church would not provide information. Complaint, ¶ 97, Ex. M. In a further effort to frustrate the investigation and to further their scheme, the Defendants also ordered Edwards & Angell LLP to forward another letter on the very same day suggesting that they were complying with Association requirements concerning the removal of members. Complaint, ¶ 98, Ex. N. (The Defendants had not so complied.) Finally, the Defendants forwarded correspondence on October 26, 2003 indicating that the Church had become disaffiliated from the Denomination. Complaint, ¶ 103. Exs. O, P. These letters furthered Defendants' efforts to cease the involvement of the Denomination and to further their efforts to control the Church through their fraudulent scheme.

extortion for the common purpose of manipulating the Church members' voting and wrongfully

obtaining control of the assets of the Church. In each instance, the purpose, participants, victims

and methods for accomplishing the predicate act of extortion were similar or same members of

the Church. The predicate acts of extortion are therefore "related." The five predicate acts of

mail fraud are also related. Defendants mailed letters in furtherance of their actions to obtain

control of the Church. Complaint, ¶ 128-129. See supra pp. 15-16.[12]

### 2. The Allegations Demonstrate Continuity.

To satisfy the continuity requirement, a plaintiff must allege facts supporting either

"closed-ended" or "open-ended" continuity. H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S.

229, 241 (1989). "Closed-ended" continuity can be established by alleging "a series of related

predicates extending over a substantial period of time." Id. Open-ended continuity can be

sufficiently pled by alleging that the "predicates are related and that they amount to or pose a

threat of continued criminal activity." Id. at 239. The Plaintiffs have alleged facts sufficient to

satisfy closed-ended[13] and open-ended continuity.

In H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229 (1989) the Supreme Court

addressed the issue of what constitutes a "pattern of racketeering activity" under RICO. In that

---

12 The Defendants wrongly rely on Effron v. Embassy Suites (Puerto Rico), Inc., 223 F.3d 12 (1st Cir. 2000) in arguing that the Plaintiffs have not pled a "pattern of racketeering activity." Effron and the other cases cited in Defendants' Motion in support of this position are inapposite. Effron involved a racketeering scheme with a single limited goal, a single injury, a single victim and no likelihood of continuing criminal activity. Id. at 18. In concluding that there was no likelihood of continuing criminal activity the Effron Court reasoned that the defendants' scheme had a "limited life expectancy" and a limited purpose--simply to squeeze the plaintiff out of the limited partnership early in the development process so the defendants' profits would be greater. Id. at 20. The only victim of the defendants' scheme was the plaintiff. Id. at 18. The plaintiff never alleged facts from which the Court could infer that the defendants would continue to defraud him or that the defendants would defraud others in different schemes. Id. at 19-20.

The Defendants' citation to the Memorandum and Order in Giuliano v. Fulton, U.S.D.C. Civil Action No. 03-11293 REK (December 23, 2003) is equally unavailing because there the Court found that the defendants' only scheme had as its sole goal the removal of property from the plaintiff's control. The Court also concluded that the Complaint did not allege facts demonstrating a threat that the defendants' criminal activity would continue. In the cases cited by the Defendants, the scheme had a built-in end point. In this case, the Defendants' racketeering has not ended. The victims are numerous and include the Plaintiffs, Church members, expelled Church members, the Denomination and the Association. Most importantly, as provided above, the Defendants will continue to conduct their criminal enterprise in the future.

13 The Plaintiffs have alleged a series of related predicate acts. Those acts occurred over a period of eleven months, which is a "substantial period of time" for purposes of satisfying the closed-ended continuity requirement. See H.J. Inc., 492 U.S. at 242 (requiring that the predicate acts extend over a period longer than "a few weeks or months").

case, plaintiffs brought a class action against Northwestern Bell Telephone Company alleging civil RICO violations. The complaint alleged that the defendant had bribed five members of a regulatory body approving the telephone company's rates in exchange for approval of higher rates. The H.J. Inc. court held that the plaintiffs alleged a "pattern of racketeering activity." Allegations concerning the frequency of the predicate acts of bribery over a substantial period of time (there six years) or by proving that the bribes were a "regular way of conducting . . . ongoing business or a regular way of conducting or participating in the conduct of the alleged and ongoing RICO enterprise" were sufficient. Id. at 250. The Plaintiffs' allegations demonstrate that the Defendants pose a threat of continued criminal activity because their use of extortion and mail fraud is a "regular way of doing business" and a regular way of participating in the RICO enterprise – the Church. Feinstein v. Resolution Trust Corp., 942 F.2d 34, 45 (1991).

The allegations demonstrate that MacKenzie and Kennedy have engaged, and continue to engage, in extortion, mail fraud and other criminal misconduct to misappropriate Church funds and misuse Church assets. The Complaint expressly alleges that MacKenzie and Kennedy will continue their scheme through the conversion of the apartment house into condominiums and subsequent misappropriation of the assets. Complaint, ¶ 6. They will continue to use extortion to enable them to obtain the votes needed to carry out this plan.

The Complaint also expressly alleges that MacKenzie and Kennedy continue to use the Church to run personal business.   Complaint, ¶¶ 107-110. The Complaint also does not suggest that their misappropriation of assets has ceased in any way. In fact, it claims that they continue to receive wrongful payments from the Church. Complaint, ¶ 110.

In addition, facts learned since the filing of the Complaint demonstrate that their wrongful activity continues. For example, upon information and belief, John Burke has forwarded checks from a Bostonview bank account to his girlfriend. MacKenzie may be receiving a salary from the Church to fulfill a position that never previously existed. MacKenzie may have taken money from the Union for the purpose of purchasing computer equipment that was never obtained. On November 12, 2003, MacKenzie formed a real estate company named Harborview Real Estate Corp. and transferred $850,000 of Church funds into it, apparently without notice to Church members. Kennedy also obtained a loan in the amount of $350,000 from the Church to purchase a home. See Ex. A. The list will continue.

### E.    **Plaintiffs Have Alleged a Derivative Claim.**

Plaintiffs submitted with their original complaint, filed on February 27, 2004, an affidavit of George Chapin which essentially verified the allegations of the Complaint. That Complaint, which was voluntarily dismissed, is identical to the present March 2, 2004 Complaint. Thus, the Chapin affidavit fulfills the verification requirements. To the extent the Court wishes to receive a verified complaint, the Plaintiffs will submit one. See Zucker v. Katz, 208 F. Supp. 525, 534-35 (S.D.N.Y. 1989)(court would allow the plaintiff to file a verifying affidavit or would dismiss the unverified complaint without prejudice and allow plaintiff to file a verified complaint).

### F.    **If the RICO Counts Are Dismissed the Court Should Not Dismiss the Remaining Claims.**

Even if the Court were to dismiss the RICO counts, this Court has discretion to retain jurisdiction over the state law claims. 28 U.S.C. § 1367(c)(3) (2004) (providing that district court may decline to exercise supplemental jurisdiction where it has dismissed all claims in which it had original jurisdiction). "The termination of the federal claim does not divest the district court of power to exercise supplemental jurisdiction but, rather, sets the stage for an

exercise of the court's informed discretion." <u>Roche v. John Hancock Mut. Life Ins. Co.</u>, 81 F.3d

249, 257 (1st Cir. 1996) (upholding district court's retention of jurisdiction over state law claims

after federal claims had been dismissed as proper exercise of court's discretion).  In this case, the

Court clearly has authority under § 1367(c)(3) to retain jurisdiction over the state law claims.

There would be no reason to dismiss them.

### <u>CONCLUSION</u>

For the reasons set forth above, Defendants' Motion to Dismiss should be denied.


THE GENERAL CONVENTION OF THE NEW
JERUSALEM IN THE UNITED STATES OF
AMERICA, INC., THE MASSACHUSETTS
ASSOCIATION OF THE NEW JERUSALEM
(SWEDENBORGIAN) and GEORGE CHAPIN,

By their attorneys,

**HOLLAND & KNIGHT LLP**


/s/ Christopher J. Trombetta_____
Geoffrey E. Hobart (BBO No. 547499)
Christopher J. Trombetta (BBO No. 556923)
10 St. James Avenue
Boston, MA  02116
(617) 523-2700

Dated:  April 5, 2004

**<u>EXHIBIT A</u>**

# Boston Sunday Globe

MARCH 14, 2004

*'A lot of these people can't even spell Swedenborgian, let alone know what it means.'*

GEORGE CHAPIN, *church stalwart*

# A tiny church, a pot of gold, an ex-con spark a bitter feud

### By Kevin Cullen
GLOBE STAFF

CHURCH, Page A22



GLOBE STAFF PHOTO/JOHN TLUMACKI

**Eddie MacKenzie (left) with the Rev. G. Steven Ellis at the New Jerusalem Church on Bowdoin Street.**

There are many places you would expect to find a South Boston hoodlum like Eddie MacKenzie on a Sunday morning, but the pulpit of the Swedenborgian Church on Beacon Hill is not one of them.

Still, there he was one recent Sunday, standing before the congregation, championing the right of this 186-year-old church to secede from the national organization of this tiny Christian sect.

"There is a renewed spirit of freedom and independence in our church," MacKenzie told the 50 or so worshipers. "We need to truly believe we are God's disciples. . . . We are filled with a revolutionary energy and spirit."

As if on cue, the choir broke into "Yankee Doodle Dandy."

Not that everyone in the pews felt like singing along. George Chapin, a church stalwart for half a century, remembers watching MacKenzie, dumbfounded, and thinking, *"What the hell is going on*

*here?"*

Edward J. MacKenzie Jr. is a man of parts — many parts.

A convicted drug dealer, he is the author of a maim-and-tell memoir about his years as a legbreaker for South Boston gangland leader Whitey Bulger.

He has been, as he describes himself, a man almost irresistibly drawn to cons and scams. He recently admitted to filing phony worker's compensation claims and is awaiting trial on charges of swindling $200,000 from an elderly woman. And he faces charges in another court that he threatened to kill his ex-wife by chaining a cinderblock to her leg and throwing her off a bridge.

He is, in short, a busy man.

But he finds time for church. Indeed, within months of joining, be became part of a new leadership circle that is shaking the rafters at Boston's Swedenborgian church — and raising doubts among some about how the church's wealth is being spent.

# On Beacon Hill, a church divided

▶ **CHURCH**
*Continued from Page A1*

Upfront about his prolific rap sheet, MacKenzie has won an ally in the church's longtime pastor, the Rev. G. Steven Ellis, who sees him as a man who turned his back on crime, a sinner seeking spiritual sanctuary. Ellis, a Bible scholar who has been pastor of the Bowdoin church for 22 years, has sided with MacKenzie against church elders, who are skeptical of MacKenzie's conversion and worried about his motives.

Ellis did more than take MacKenzie's side. He nominated him for church treasurer, pushing aside his own mother-in-law.

And so in September, MacKenzie took office. It seemed like a very auspicious move.

For while the Bowdoin Street church is poor in numbers, it is rich by any other measure — and may soon become much richer. The church owns an 18-story apartment building above the chapel that churns out more than $1 million a year in clear profit, according to an October audit by the church's accountant. And a plan has been floated in Boston real estate circles to convert the building to condominiums, a move that the church estimates could yield as much as $75 million.

The new leaders say they are trying to reenergize a moribund institution, to recruit new members and more aggressively manage church assets. There are already indications, beyond the possible conversion of the building, of a more freewheeling approach to church finances.

The church trustees recently voted to make a $350,000 loan to one of the new church leaders — a loan authorized but apparently not used. A lump sum of $850,000 has been transferred to a real estate company in which MacKenzie and another church leader were founding officers. And church bylaws have been changed to make it easier to sell church property and to remove a ban on church leaders' profiting from such sales.

They are the kinds of changes that deeply unsettle some longtime church members, changes that led the national church to file a civil countersuing lawsuit against the new leadership March 2 in US District Court.

The suit claims the new leaders "have utilized a pattern of racketeering activity to wrongfully take control of a 185-year-old church to obtain dominion over its

$30 million apartment house, which now generates more than $1.2 million in annual income." The suit seeks to void the membership of more than 40 people who joined the church in the last two years, and to transfer the church's assets to the national organization.

"MacKenzie is a criminal," the suit alleges. "He has infiltrated the Church only to access its resources for his own personal benefit."

Chapin, one of the plaintiffs, said many of the new members were rushed into the church, without proper training in Swedenborgianism, to rubberstamp the self-serving agenda of the new leadership.

"A lot of these people can't even spell Swedenborgian, let alone know what it means," he said.

Christine Laitner, the vice president of the national Swedenborgian organization, says her group authorized the Boston law firm of Holland & Knight to file the suit "to protect not just the assets of the Boston church, but the history and the legacy and the purpose behind the establishment of this church."

"What's happened in Boston is a shame," she said.

The Boston church's lawyer, Gerald P. Hendrick of Edwards & Angell, calls the lawsuit meritless, while MacKenzie and other church leaders dismiss it as sour grapes.

"Some of these older members appear to have an ax to grind," Hendrick said.

Word that a man of MacKenzie's reputation would have a hand in deciding how the church spends its wealth has also filtered to the office of Attorney General Thomas F. Reilly. And almost as soon as Reilly's investigators began swooping around the church last November, demanding its financial records, MacKenzie stepped down as treasurer. He is now the church's chief of operations.

With his hangdog eyes and what-me-worry disposition, 45-year-old Eddie MacKenzie seems serene as he contemplates the maelstrom he helped create. He says he'll beat the rap in his upcoming trials. His accusers are lying, he says, and besides, he's got religion. When he was a young thug, selling coke on street corners and roughing up rivals, his horizon stretched no farther than Winter Hill in Somerville, where Irish pug-ugly clotted mayhem and formed a gang named after the hill, a gang whose boss was Whitey Bulger. Now MacKenzie sits in a church on Beacon Hill, a new man.



**A QUESTIONED LEADER**  Former South Boston mob foot soldier Eddie MacKenzie says he was first attracted to Beacon Hill's Swedenborgian church when a friend told him that it paid college tuition for members' children. Now, as a church leader, he insists he has nothing but good intentions for the institution, although he adds that he understands how some people would think ill of him. "For some people, I'm always going to be a scumbag," he says.

"I love this church," he says. "I've kind of found my niche."

## The Church on the Hill

Boston's Swedenborgian church, known legally as the Boston Society of the New Jerusalem, known colloquially as the Church on the Hill, is named for the 18th-century Swedish scientist and philosopher Emanuel Swedenborg, who believed that Jesus Christ has already made a second coming, in spirit rather than in person.

Swedenborg's unorthodox analysis of the Bible was denounced as heresy by some mainstream Christians, but it quickly won adherents. Among the tenets of Swedenborgianism is that believers, not God, decide their own afterlife.

"The church is within man," he wrote. Swedenborg died in 1772, at the age of 84, and the first group of Swedenborgians organized themselves in London 15 years later. By the early 1800s, churches were sprouting up in the United States.

The church spread rapidly in an era of spiritual and intellectual awakening. It was at the forefront of what today would be called progressive thinking. In the mid-19th century, the church advocated for coeducation. In the 1920s, one of its most prominent members, Helen Keller, led the fight for rights for the disabled. Today, the movement is greatly diminished, though there are affiliated churches in more than 30 countries. There are five Swedenborgian congregations in Massachusetts. Officials at the national office in Newton say there are about 1,500 active Swedenborgians nationwide, down from 3,000 a decade ago.

The Boston congregation, founded in 1818 by a group of Harvard students and

alumni, is the fourth oldest, and became what Marguerite Block, a church historian, called "the real center of the New Church" in America. New England has long occupied a special place in the church's history, in part because some of the region's leading intellectuals, from Ralph Waldo Emerson to Henry James, were influenced by Swedenborg's writings. Among the region's most famous Swedenborgians were the poet Robert Frost and a Leominster native named John Chapman, better known as Johnny Appleseed.

The Swedenborgians' first church in Boston, a Gothic cathedral built in 1844 on Bowdoin Street, adjacent to the State House, had seating for more than 1,000. But as the years passed on, so did many of the Brahmins who made up much of the congregation. With numbers down and the oversize church crumbling, the congregation decided in 1966 to tear the edifice down and replace it with an apartment building that housed a small church. The ground-floor chapel has room for about 100; the 143 apartments above would yield, they hoped, sufficient income to sustain the local disciples of Swedenborg for generations to come.

And, as it had for generations, the church on Beacon Hill dispensed its version of Christianity and did its good works in relative obscurity. Whatever was left over from paying for upkeep of the apartment building was used to pay for college educations for members' children and, occasionally, a deserving charity case. But it has the means to do much more. With about 100 members, and a mortgage-free building that real estate appraisers say is worth at least $30 million, the church is surely, per capita, among the wealthiest to

be found.

## A time of turmoil

And so it was, almost two years ago, that Eddie MacKenzie arrived at the Boston church at a time of extraordinary economic opportunity. But it was also a time of unprecedented turmoil, a feud in the church's leading family, in fact.

Ellis, the pastor, had had a bitter falling out with his wife's parents, Bobby and Joan Buchanan, who for more than a decade had been officers in the church. Joan Buchanan was treasurer, and she was generally given high marks by the membership for managing its finances. But in recent years, Ellis and the Buchanans have clashed with increasing frequency over church matters. At the church's annual membership meeting last May, Ellis handed out a flier with the names of church officers he planned to vote for. His in-laws were not on the list, but Eddie MacKenzie was. Later, the Buchanans were expelled from the church.

The Buchanans declined to be interviewed by the Globe. But Ellis said they took their concerns to the church's state and national organizations, saying they worried about his mental stability.

Would any man of good judgment, they wondered, have so swiftly turned the church's leadership over to MacKenzie? Or to Thomas J. Kennedy, a former MBTA auditor who, while never accused of wrongdoing like MacKenzie, was one of MacKenzie's early supporters and became, within a year of joining, the church president?

Some longtime members, like Thomas Peebles, whose family has been in the church since its founding, were similarly distraught at the change in leadership and direction.

"Many of us," said Peebles, a physician and former head of the Harvard Community Health Plan, "are understandably distressed at the hostile takeover by a newly elected and closely knit group of friends and relatives, which include an admittedly criminal element among its leaders."

Last August, the national organization's Misconduct Determination Board took up the Buchanans' cause and sent Ellis a letter saying it was "very concerned about the physical, mental, and spiritual health of Steve Ellis." The board proposed appointing a consultant "from outside the Swedenborgian Church" who could work with Ellis in, among other things, "assuring fiscal propriety."

Ellis, whose three decades in Boston have done little to diminish a downhome drawl from his native Kentucky, looks something like Friar Tuck, with his beard and ample girth. But his demeanor took on a furious edge after he learned that his in-laws and the national and state associations had joined forces against him.

"My integrity and service to the

Church has been defamed," Ellis wrote in his letter of resignation to the national group. "I have been treated worse than a criminal."

At Ellis's prompting, and with MacKenzie's and Kennedy's active lobbying of church members, the church abruptly severed ties with the national organization to which it had been bound since its founding, and quit the state association with which it had been affiliated since 1835.

MacKenzie says the critics of the new church leadership badly miscalculated the membership's loyalty to Ellis.

"They attacked Steve's integrity when they should have attacked me and Tom Kennedy," MacKenzie said. "No one complained when I came into the church and was just serving food or cleaning up. Once they found out I was running for treasurer, I became a highranker. It's OK to throw someone like me a bone, but not with any meat on it."

Liberated from the oversight of the national and state associations, Ellis, Kennedy, and MacKenzie set about instituting their church from what Ellis described in an interview as "outside enemies."

Under a new set of church bylaws drawn up in November, it became much easier, and much faster, for new members to join. Ellis was given complete discretion in deciding who would be confirmed and how. Newcomers can now be admitted by a simple majority vote of existing church members; before, a two-thirds vote was required. Required doctrinal training, emphasizing Swedenborg's writings, was eliminated.

Gone, too, was a provision that any sale of church property be approved by two-thirds of members, and one that barred individuals from enriching themselves with church assets. A new provision calls for the expulsion of members deemed unworthy by a simple majority.

There is one other new mandate. Any changes to church property must now "be directed by a Director of Operations."

That would be Eddie MacKenzie.

He says he knows very well what his critics think: that he and a band of crooks are pocketing cash, spending it freely, squirreling it away in new accounts. It is baseless and insulting talk, he says.

"You can't take money here. There are systems in place. I couldn't steal money here even if I wanted to," he says, hesitating slightly before adding, "and I don't want to."

## 'He preys on people'

So how did the New Church and MacKenzie, Swedenborg's and Southie's own, come together?

MacKenzie says he was first attracted to the church when a friend told him that one of its traditions was to pay college tuition for members' children.
Continued on next page



**VALUABLE ASSET**  The church, known officially as the Boston Society of the New Jerusalem, sits beneath an 18-story apartment building on Bowdoin Street that churns out more than $1 million a year in profit. The new church board is considering selling the building.

Continued from preceding page

ition for members' children. But he says his goal now is to put the church's wealth to work for the disadvantaged, not himself. He said he is doing so well financially, between book sales and what he said is a soon-to-be-finalized movie deal, that he may not even need to ask the church to pay for the college educations of his five daughters.

MacKenzie says he has not read much of Swedenborg but had read enough to appreciate his "genius." He says it was Ellis's charismatic sermons that captured his imagination.

"It was more about him talking about Daniel Boone and Davy Crockett than Emanuel Swedenborg," he said of Ellis's proselytizing.

Ellis says his great-great-great-great-great-grandfather was a close friend of Boone's.

MacKenzie says he did not hide his past from Ellis or anyone else he met at the church.

Ellis bought 50 copies of his book and gave them to church members.

The book, "Street Soldier: My Life as an Enforcer for Whitey Bulger and the Boston Irish Mob," is an account of Mac-Kenzie's disadvantaged childhood and life of crime. In it, he gleefully describes the pleasure he took in mayhem, including swallowing a finger he bit off an adversary. Some critics have called the book a wildly embellished tale of his role in Whitey's world.

MacKenzie's book is also frank about how hard he has found it to leave behind his criminal life.

"Crime is a way of life, an addiction," he writes.

In the final chapter, he observes: "Every day I face a choice: continue to change or fall back to the comfortable, darker ways of my predator side. Too often I retreat to scams and doing 'collections' for people. The money is good and easy, and the accompanying rush of adrenaline is probably close to what one gets in closing a legitimate business deal."

When asked whether she believes her former husband has changed his ways, Carla MacKenzie laughs ruefully before answering.

"There is no redemption in this story," she says. "I don't think Eddie could change even if he wanted to. . . . He preys on people with good hearts and takes them for what they are worth. I went through seven years of hell and therapy. I feel sorry for those people at that church."

In a criminal complaint for which Eddie MacKenzie is awaiting trial in Boston Municipal Court, Carla said that on Dec. 23, 2002, a month after he was accepted as a member of the church, Eddie called her after finding out she was a witness against him in a worker's compensation fraud case. According to the complaint, she told police that he "swore on his kids' life that he would kill her if she ever testified against him." Specifically, she said, he would have her "legs chained to a cinderblock and have her thrown over a bridge."

MacKenzie says that his former wife is lying, and that she has a pathological desire to destroy him.

Though he vigorously defends his honor in the pending cases, MacKenzie says

he understands why some people would think ill of him.

"For some people, I'm always going to be a scumbag," he says. "There's nothing I can do about that."

Ellis, for his part, sees MacKenzie as bringing just the sort of new blood the church needs. Unlike some of those now complaining about the new direction of the church, he said, MacKenzie has not missed a service since joining.

"The disgruntled people said: 'We need doctors and lawyers and professionals. We don't need bums.' Well, I found that under the bum stuff were some brilliant people," Ellis says.

MacKenzie also sees snobbery behind the opposition.

"There are about six or seven families who are complaining," he says. "This church was the best-kept secret on Beacon Hill. These people were taking care of their families and their relatives, not the church. . . . We've opened up the church, and we're going to continue to open it up."

Certainly, the new regime has brought many new members in. Church records show that at least 45 of its 105 members joined the church over the past two years, 38 of those in just the past year. MacKenzie said he's brought in about 10 friends and relatives.

Ellis says that shows an open-door policy. Disgruntled members say the new regime stacked the pond with loyalists.

Ellis, meanwhile, says he is not troubled by MacKenzie's notorious past.

"Paul," the minister said, "was a murderer" before he became a saint.

Other Swedenborgians are more skeptical. The Rev. Lee Woofenden, pastor of a Swedenborgian church in Bridgewater, says he read MacKenzie's book and was disturbed.

"I'm a minister, and I believe in redemption," Woofenden says. "I believe people can reform. But I'm also a pragmatic person, and I don't believe that you take people who have been convicted of wrongdoing and put them in charge of your church. I think the Boston church has acted irresponsibly by putting a convicted felon in such a position of authority."

### Financial maneuvers

Whether it is bold leadership, or, as the lawsuit alleges, some sort of self-serving conspiracy, the new power brokers at the church have been hard at work.

Late last year, John B. Burke, who replaced MacKenzie as treasurer Dec. 6, just a month after becoming a church member, began approaching property developers, asking if they were interested in converting the apartment building into condominiums.

Burke is the former co-owner of a South Boston nightclub who now works at a real estate firm on Cape Cod. In the early 1990s, he unsuccessfully tried to open an upscale strip club in the Combat Zone.

A Boston College graduate, he was an enthusiastic convert to Swedenborgianism. Upon being accepted as a member of the church in November he asked to be baptized in the Charles River.

And he is bringing his business smarts to bear on church finances. One property developer who saw the church's proposal Burke was circulating among potential investors, and who asked not to be identified, told the Globe, "They are looking for the capital and the ability to convert it."

The developer said the church's proposal estimated that, depending on the

quality of the converted condos, the project could fetch up to $75 million — proceeds that, if properly invested, the church could live off of perpetually. Former leaders of the church said they, too, had considered selling off the building but decided that funding the church with steady rents was a better option than cashing out.

Filings in the secretary of state's office, meanwhile, show that MacKenzie and Burke formed a private real estate company, Harborview Real Estate Corp., on Nov. 12. It was, as it happens, one day before the attorney general wrote to the church, demanding its records.

Burke says the idea of converting the apartments to condos is just one of several options the new leadership is considering. "These are very informal discussions," he says.

Burke says that Harborview is owned by the church, that it was created as "an investment vehicle" in which church leaders could have access to church funds that were previously tied up with the company that manages the apartment building. He says $850,000 was deposited into Harborview, with "a lot of money in annuities," and that the new corporation provides "normal diversified" flexibility.

Hendrick, the church's lawyer, says MacKenzie was recently removed as an officer of Harborview, which he described as being wholly owned by Bostonview, the corporation that owns the apartment building, which is wholly owned by the church.

If Harborview was created legally, it was also created quietly. Several church members told the Globe they've never heard of it.

The Globe obtained an internal church document showing that church trustees and directors on Nov. 12 authorized Kennedy to borrow $350,000 from the church to buy a $423,500 home in Plainville. Kennedy said he subsequently turned down the loan.

"I declined it because of everything that was going on," he says. "The timing was wrong."

John Perry, who was baptized in the Boston church in 1929 and who was voted off the board of trustees last year, says the sudden, wholesale change in leadership,



**'IT MAKES NO SENSE'** John Perry (with his wife, Anne), a lifelong member of the church who was voted off its board last year, says the sudden change in leadership was rash. "It makes no sense, but it makes cents, as in dollars and cents," he says.

and the moving of large sums of money, was rash.

"It makes no sense, but it makes cents, as in dollars and cents," says Perry, who is suspicious of the new leaders.

### The future

The attorney general is looking over their shoulder. Their erstwhile no-religionists have sued them. But the new leaders say they are undaunted as they reconfigure their obscure church into what they hope is a bigger presence in the city.

On Feb. 8, about 50 people gathered at the church for the 316th birthday of Emanuel Swedenborg. They listened as a Croatian minister for a different Swedenborg sect described how when he took over a church in Pennsylvania years ago, the congregation was fighting among itself. The older members thought they had the right to dictate to the younger ones. Sitting in a chair behind the visiting preacher, Steve Ellis closed his eyes and nodded.

"Praise God," Ellis said.

After the service, the congregation, many of them elderly, a few of them children, moved upstairs and took their seats on long tables with paper tablecloths and plastic cups of juice and soda to watch a play about Swedenborg's correspondence with the Queen of Sweden. Two actors in period costumes traded bon mots, a performance that was greeted with a mixture of smiles and seeming bewilderment from the audience.

"Most of these people are poor," Eddie MacKenzie said, surveying the room from the back, his arms folded.

He says these people are getting better food, better treatment, more respect, than they did under the old regime. There are more field trips. He's started a senior luncheon.

MacKenzie's got plans, big plans. He envisions the church putting on more theatrical performances for a wider public. He likes the idea of the church sponsoring youth athletic teams.

"Why not a team from Southie and a team from Roxbury, wearing uniforms with the church's name on them?" he asks.

All this costs money, but as Eddie MacKenzie says, "We've got the money."

---

## History of the church

**1688** — Emanuel Swedenborg born in Stockholm, Sweden.

**1745** — Swedenborg says God appeared to him and told him a human was needed to serve as the means by which God would further reveal himself to mankind. Thus began Swedenborg's spiritual life.

**1749** — Swedenborg publishes his first theological work, anonymously, called "Heavenly Secrets."

**1772** — Swedenborg dies.

**1787** — Fifteen years after Swedenborg's death, a group of 11 followers in London form the Church of the New Jerusalem based on his theological works.

**1817** — The first New Jerusalem church in the United States is founded in Pennsylvania. It becomes the Swedenborgian Church of North America.

**1818** — A Boston congregation of the church is founded by a group of Harvard University students and alumni. It becomes the North American congregation.

**1844** — The Boston congregation builds its first major church, on Bowdoin Street atop Beacon Hill, with seating for 1,000.

**1966** — With membership dwindling, the Bowdoin Street church is torn down and replaced by an apartment building over a smaller chapel with seating for 100.



The interior and exterior of the Bowdoin Street church, before it was torn down in 1966 and replaced with a smaller chapel and an apartment building.