UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE GENERAL CONVENTION OF THE NEW JERUSALEM IN THE UNITED STATES OF AMERICA, INC., THE MASSACHUSETTS ASSOCIATION OF THE NEW JERUSALEM (SWEDENBORGIAN), and GEORGE CHAPIN,<br><br>        Plaintiffs,<br><br>v.<br><br>EDWARD MACKENZIE, THOMAS KENNEDY, BOSTON SOCIETY OF THE NEW JERUSALEM, INCORPORATED (SWEDENBORGIAN), and BOSTONVIEW CORPORATION,<br><br>        Defendants. | C.A. No. 04 10419 WGY |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS',
BOSTON SOCIETY OF THE NEW JERUSALEM,
INCORPORATED (SWEDENBORGIAN)'S AND
BOSTONVIEW CORPORATION'S, MOTION TO DISMISS**

Plaintiffs, The General Convention of the New Jerusalem in the United States of America, Inc. (the "Denomination"), The Massachusetts Association of the New Jerusalem (Swedenborgian) (the "Association"), and George Chapin ("Chapin"), hereby submit their opposition to the motion to dismiss filed by Defendants, Boston Society of the New Jerusalem, Incorporated (Swedenborgian) (the "Church"), and Bostonview Corporation ("Bostonview") (collectively, the "Defendants").

## INTRODUCTION

MacKenzie is a con man and a convicted cocaine trafficker. He also acted as a physically brutal enforcer for Whitey Bulger. In a July, 2003 videotaped interview, MacKenzie stated that he lacks any remorse for his criminal activities, which include, for example, savage beatings, severing and eating an individual's finger and trafficking drugs. He also stated that he still

maintains the demonic and criminal character which permitted him to carry out his actions concerning the church.

MacKenzie's actions have been extreme. In fact, his former wife has claimed that during the period where he allegedly acted as a "leader" of the church, MacKenzie threatened to kill her. See Ex. A. Such activity is clearly inconsistent with any alleged interest in the real teaching of the Church. MacKenzie has infiltrated the Church only to misappropriate its resources for his own personal benefit.

He has done so by using extortion and mail fraud to obtain control of the votes of a majority of Church members. Such votes are needed to carry out many Church actions. He has used similar actions to cause himself and others friendly to him to be elected as officers and trustees of the Church and directors of its wholly-owned company, Bostonview, which owns the $30 million apartment house. Such actions have also permitted him to control the Church and to misappropriate Church funds. He has also caused the Church to disaffiliate itself from the Denomination only after it sought to remove or closely monitor the Church's pastor, whom MacKenzie needs to further his plan.[1]

## FACTS

Since its creation in 1818, the Church has been affiliated with the Denomination.[2] Complaint, ¶ 18, 20. With the assistance of the Denomination, Reverend G. Steven Ellis

---

[1] The Church created Bostonview in 1963 when it purchased the apartment house. The apartment house is located at 140 Bowdoin Street, Boston, Massachusetts. It contains more than thirty apartments. The Church and its offices are located on the first floor of the apartment house.

[2] Throughout its history, the Church has obtained a variety of benefits from the Denomination such as financial assistance for ministerial salary when needed; itinerant ministerial services when the Church was without a resident pastor; teaching aids and methodologies for child and adult religious education programs; involvement in denominational youth programs; funding for projects of outreach and publication; retirement benefit(s) for minister(s) in the Church's employ; regular communication and information from the network of the Denomination's societies and centers in North America; and voting privileges in the ongoing work of the Denomination. It has used the services of the Denomination to obtain ministers; to obtain the services of trained consultants in the areas of stewardship, board training and process, and outreach programs; and it has relied on Denominational services to assist in establishing interim pastoral positions as needed. Complaint, ¶ 9.

("Reverend Ellis") became the Church's Pastor in 1982. He had graduated from the Denomination's post-graduate seminary. As Pastor, he coordinated the religious activities of the Church. Complaint, ¶ 26.

During his pastorship, Reverend Ellis's behavior changed considerably and detrimentally. He became, apparently, a manic depressive. As a result, he became detached and difficult to reach by telephone and otherwise. His sermons oddly focused on issues relating only to himself and not on Swedenborgian principles. He frequently yelled and screamed. He no longer dedicated time toward certain charitable activities. Complaint, ¶¶ 28-29.

In 2002, Thomas Kennedy, a new Church member with an unfavorable and apparently undisclosed background, observed the mental instability of Reverend Ellis.[3] Kennedy befriended Reverend Ellis only to later take advantage of him. In that regard, Kennedy became president of the Massachusetts New Church Union (the "Union") with Reverend Ellis' assistance. The Union is a non-profit corporation which holds millions of dollars in assets of the Massachusetts Association of the New Jerusalem (Swedenborgian) (the "Association"). Complaint, ¶¶ 32-36.

Thereafter, Kennedy utilized that position only for his own personal financial benefit. For example, without authorization or justification, he attempted to transfer approximately $1 million in Union funds to an account over which only he had the power of withdrawal. Complaint, ¶ 39. See Ex. B. The Union prevented the transfer. Complaint, ¶ 40.

Most important is that during his time as President, Kennedy recruited Edward MacKenzie, a con man, to assist in dissipating the assets of the Union. MacKenzie was an enforcer for Whitey Bulger in the 1980s. He was convicted and has served time in prison for

---

[3] Kennedy has a history of unfavorable, if not criminal, behavior. Upon information and belief, Kennedy had engaged in fraudulent loan transactions. He also no longer maintained his job in the area of finance at the MBTA. Complaint, ¶ 31.

trafficking cocaine.[4]  Complaint, ¶¶ 52-58.  MacKenzie's participation accelerated the

misappropriation of Union assets.  Complaint, ¶ 38, Ex. A; ¶¶ 43-47.  As a result, the Union

forced Kennedy to resign.  Complaint, ¶¶ 48-49.

### MacKenzie and Kennedy Take Actions Needed To
### Control The Church And Its $30 Million Apartment House
### and to Misappropriate Church Assets

In or about November and December, 2002, MacKenzie and Kennedy also began to

focus their attention on the Church.  MacKenzie, who also recognized Reverend Ellis's mental

instability, undertook efforts to befriend and then control him.  Complaint, ¶¶ 59-60.

After obtaining Reverend Ellis's trust, MacKenzie then carried out his fraudulent

takeover of the Church.  Initially, he intimidated members of the Church's Board of Trustees and

the Church Council.[5]  For example, he extorted the Trustees into funding tuition associated with

MacKenzie's daughter's attendance at a private secondary school.  Never had such an

expenditure been approved.  Only college tuition had been reimbursed.  MacKenzie and

Kennedy also caused Reverend Ellis to pay them as much as $25,000 from the Church's relief

fund.  Such a practice had never occurred in the past.  Complaint, ¶¶ 61-63.

MacKenzie and Kennedy also obtained control over a majority of members.  Votes from

a majority of the membership are needed to approve various actions.  MacKenzie and Kennedy

obtained this control by using fear and intimidation to force the Church Council and the Church

Membership to admit family members and friends as members.  Many of these individuals had

never even visited the Church, been confirmed into the Swedenborgian faith as is required by the

---

[4] MacKenzie continues to engage in fraud.  For example, he reportedly swindled an elderly woman out of more than $20,000 in 2001 by claiming that he would locate her son who had disappeared.  Complaint, ¶ 57, Ex. D.[4]  He also reportedly received more than $30,000 in fraudulent workers' compensation payments in 2001 based on a fabricated disability.  Complaint, ¶ 58, Ex. E.

[5] The Church's Board of Trustees manages the financial and other activities of the Church.  The Church Council controls membership and other activities.  Members of both bodies are comprised of Church members.  Complaint, ¶¶ 24-25, 53, Ex. C, Art. IX.

Church's by-laws or even attended the meeting at which MacKenzie sought to have them elected as Church members. Complaint, ¶¶ 64-74, Ex. C, Art. IV, Sec. 3.

MacKenzie then used his control over new members and extortion of elderly members to fix the outcome of the votes at an annual meeting held in May, 2003. Complaint, ¶¶ 75-79. As a result, he and Kennedy obtained control of the Church's Board of Trustees. Complaint, ¶¶ 75-80. MacKenzie also forced the Members to elect him, a convicted felon, as Treasurer. Complaint, ¶ 80.

The positions as Trustee and Treasurer could not become effective until September 1, 2003. On September 2, 2003, MacKenzie and Kennedy tried to obtain from the Church's bank payment of $10,000 in checks payable to them. The Bank refused. Complaint, ¶ 83. MacKenzie and Kennedy later obtained payment of the unjustified request of $10,000 from the Church. Complaint, ¶ 84-88.

On September 21, 2003, MacKenzie and Kennedy used extortion and their control over new members to become elected as directors of Bostonview, the entity which owned the apartment house. MacKenzie and Kennedy then caused a letter to be sent to the property manager on September 23, 2003, setting forth the new members of the board of directors. Complaint, ¶ 89, Ex. J.

### The Church Disaffiliates Itself From the Denomination

As a result of MacKenzie's actions up to May, 2003, several Church Members asked the Denomination to conduct an investigation as to the practices of Reverend Ellis. Complaint, ¶ 91, Exs. H & K. As a result of the investigation, the Denomination presented Reverend Ellis with three options: (1) he could be closely supervised for six months; (2) he could be suspended for

one year; or (3) he could have his credentials as a Swedenborgian minister revoked. MacKenzie could not lose control of Reverend Ellis. Complaint, ¶¶ 94-95.[6]

Fearing that the Denomination's order would become effective, MacKenzie and Kennedy forced the Church Membership to vote in favor of disaffiliation from the Denomination. MacKenzie's and Kennedy's family members and friends voted as directed. MacKenzie and Kennedy then misrepresented to the remaining members the reason for the vote. They did not disclose that continued affiliation with the Denomination would foil their plan to continue to control the Church and its apartment house. They also did not address Reverend Ellis's mental incapacity. Instead, they portrayed the vote as one needed to save Reverend Ellis from what they asserted were wrongful actions of the Denomination. Many of the remaining Church members then voted in favor of disaffiliation. Complaint, ¶¶ 101-102. By letters dated October 26, 2003 to the Denomination and the Association, MacKenzie and Kennedy furthered their fraudulent scheme by causing the Church to communicate its disassociation to the Denomination and the Association. Complaint, ¶ 103, Exs. O and P.[7]

---

[6] At or about this time, the Association's Executive Committee also failed to recognize the expulsion of members by MacKenzie's Church. Complaint, ¶ 96. Ex. L. The Association also intended not to recognize newly-admitted members to the Church. Those actions would also be difficult for MacKenzie and Kennedy to manage. He and Kennedy needed these votes to control the majority vote of the Membership. They did not need an investigation as to whether the memberships were valid, which they were not. Accordingly, MacKenzie and Kennedy directed Edwards & Angell, LLP to send two letters to the Association in an attempt to frustrate their resolution. Complaint, ¶¶ 97-98. Exs. M & N. The first letter attempted to avoid the production of information. Complaint, ¶ 97, Ex. A. The second letter attempted to follow the language of the resolution in an effort to avoid an investigation as to the expulsion of members. Complaint, ¶ 98, Ex. N.

[7] Since obtaining control of the Church, MacKenzie and Kennedy have moved businesses in which they have an interest into the offices of the Church. They did so only to utilize Church administrative help and to avoid the costs that they would otherwise incur. Complaint, ¶¶ 107-110. MacKenzie and Kennedy have also caused John Burke, a real estate broker, to join the Church. He will assist MacKenzie and Kennedy in connection with the sale of the apartments as condominiums. Complaint, ¶ 109.

At the time of the disaffiliation, the Church had not amended its by-laws at this time.

They provided:

> In the event that the religious body known as the Boston Society of the New Jerusalem, Inc. shall cease to exist, all funds and holdings shall be transferred to the General Convention of the New Jerusalem in the United States of America.
>
> These assets shall be held in escrow for the establishment of another General Convention of the New Jerusalem (Swedenborgian) Church within the City of Boston, Massachusetts.  After a period of twenty (20) years, should no such Church exist, the capital and income therefrom shall revert to the General Convention of the New Jerusalem (Swedenborgian) with any restrictions of uses which may have been voted by the Society members at the time of dissolution.

Complaint, Ex. C, Art. X, Sec. 3 (emphasis added).

Accordingly, as a result of the disaffiliation, all Church assets, including the $30 million apartment house, should have been transferred to the Denomination.  Complaint, ¶ 106.

## ARGUMENT

### A.    This Court Possesses Subject Matter Jurisdiction Over this Matter Because Plaintiffs' RICO Claims Are Viable.

As stated in Plaintiffs' Opposition to MacKenzie's and Kennedy's Motion to Dismiss, Plaintiff's RICO claims are viable.  (Contents are incorporated herein.)  Thus this Court possesses subject matter jurisdiction over this matter.

### B.    Plaintiffs Have Standing to Bring Declaratory Judgment Claims Against the Church and Bostonview for Breach of the By-Laws

In Count IV of the complaint, Plaintiffs seek a declaratory judgment that the Church and Bostonview breached the Church by-laws due to the Church's failure to transfer its assets to the Denomination to be held in escrow until a new church that is affiliated with the Denomination is formed in Boston.  Complaint, ¶¶ 141-146.  In Count V of the complaint, Plaintiffs seek a declaratory judgment establishing that the Church's admission of members who were not confirmed before joining the Church and the Church's expulsion of members of the church are

without effect because both acts were committed in violation of the by-laws of the Church. Complaint, ¶¶ 147-153. Plaintiffs may pursue each of these claims because they seek remedies for violations of individual rights, not rights of the public.

Under the Massachusetts General Laws, the Attorney General is charged with the responsibility only of protecting the public interest by preventing breaches of trust in the administration of public charities. MASS. GEN. LAWS c. 12, § 8 (2002); Dillaway v. Burton, 256 Mass. 568, 573 (1926). However, it is well settled law in Massachusetts that a private plaintiff has standing to bring claims against a public charity where the plaintiff "asserts interests in such organizations which are distinct from those of the general public." Weaver v. Wood, 425 Mass. 270, 277 (1997) (acknowledging that plaintiffs have standing to assert a claim against a public charity when the claim arises from a personal right that directly affects the plaintiff).[8]

In Trustees of Dartmouth College v. City of Quincy, 331 Mass. 219 (1954), the College sued the City of Quincy as trustee of a charitable trust seeking a determination as to whether the City was properly managing the income of the trust. Id. at 224. According to the language of the Trust, if the City of Quincy failed to comply with the words and intent of the will conveying the trust to the City, then the trust would be bequeathed to Dartmouth College. Id. at 222. The Supreme Judicial Court held that the College had independent standing to petition the court in this matter because the College held "a special interest in the maintenance of the fund, to which it will be entitled on the happening of the contingency stated in the will." Id. at 225.

---

[8] See also Lopez v. Medford Cmty. Ctr., Inc., 384 Mass. 163, 167-68 (1981) (holding that the plaintiffs had standing to litigate their claim that they were unlawfully denied membership from a public charity due to the general policy of the directors to perpetuate themselves in office in violation of the corporation's by-laws defining its governance); Eustace v. Dickey, 240 Mass. 55, 86 (1921) (rejecting application of attorney general to intervene, court held that plaintiff had standing to sue directors of church concerning his removal as trustee because claim asserted was "a matter of direct interest to the parties present to the proceeding.").

Here, plaintiffs similarly have standing to assert a claim against the Church and Bostonview for breach of the by-laws because plaintiffs have a private right of entitlement to the assets of the Church pursuant to the Church by-laws that is distinct from the general right of the public.

### 1.    The Denomination May Sue for Enforcement of Church By-Law Provision Indicating that the Denomination Should Receive the Church's Assets.

At the time of the Church's withdrawal from the Denomination, the Church's by-laws provided:

> In the event that the religious body known as the Boston Society of the New Jerusalem, Inc. shall cease to exist, all funds and holdings shall be transferred to the General Convention of the New Jerusalem in the United States of America.
>
> These assets shall be held in escrow for the establishment of another General Convention of the New Jerusalem (Swedenborgian) Church within the City of Boston, Massachusetts.

See Complaint, Ex. C (emphasis added).

Viewing the facts in the light most favorable to the Plaintiffs, this provision specifically provides that the Church's assets will be held in escrow by the Denomination until "the establishment of another General Convention of the New Jerusalem (Swedenborgian) Church" in Boston. See Complaint, Ex. C. Thus, any disaffiliation of the Church from the General Convention of the New Jerusalem (i.e., the Denomination) triggers the applicability of this provision. See infra pp. 16-20.

In the present case, the Church disaffiliated itself while the current by-laws were effective. Complaint, ¶¶ 100-106. At the time of disaffiliation, all Church assets should have passed to the Denomination. See Complaint, ¶¶ 105-106; Complaint, Ex. C, Article X, Section 3. Under the Church by-laws, the Denomination is now entitled to hold those assets in escrow until the creation of a new Church that is affiliated with the Denomination. See id. Therefore

the Denomination has standing to assert breach of by-law claims against the Church and

Bostonview because it has a particularized, private interest in the action.  As a party specifically

identified in the by-laws, the Denomination has a specific interest in ensuring that the assets are

held in escrow and are available for use by a future affiliated Swedenborgian church.  See

Eustace v. Dickey, 240 Mass. at 86.[9]

### 2.    Plaintiff George Chapin May Sue to Oppose the Removal of the Effectiveness of His Vote.

Plaintiff George Chapin has standing to bring a claim against the Church and Bostonview

for invalidly admitting new members and improperly expelling long-time members of the

Church in breach of the Church by-laws.  The leadership of the Church has conducted a

systematic campaign to improperly admit unconfirmed members for the purpose of taking

control of the organization.  Complaint, ¶¶ 66-70.  These actions have diluted Chapin's vote to

such a degree that the power of his vote is effectively removed.

The Supreme Judicial Court of Massachusetts has recognized that a plaintiff has standing

to assert claims against a public charity where the plaintiff has a right to exercise a vote in

connection with some aspect of the charity's affairs and is prohibited from doing so.  See Lopez

v. Medford Cmty. Ctr., Inc., 384 Mass. 163 (1981); Jessie v. Boynton, 372 Mass. 293 (1977);

Mitchell v. Albanian Orthodox Diocese in America, Inc., 355 Mass. 278 (1969).

In Lopez v. Medford Community Center, the Massachusetts Supreme Judicial Court held

that the plaintiffs had standing to litigate their claim that they were unlawfully denied

membership to the center after the plaintiffs paid their dues and became associate members

because the community center's board of directors would not recognize the plaintiffs' votes or

the fact that the plaintiffs elected their own slate of officers for the community center.  Id. at 165,

---

[9] Furthermore, the Attorney General is aware of this action against the Church and Bostonview and has declined to join the suit.

168.  The Court stated that the plaintiffs had standing to bring claims that the denial of the

plaintiffs' membership was caused by "a general policy of the directors to perpetuate themselves

in office in violation of those provisions of the corporation's by-laws defining its governance."

Id. at 168.[10]

Similarly, in this case, the leadership of the Church instituted a systematic campaign to

ensure their continued dominance by improperly admitting new members who were not

confirmed or who had never even visited the church, in violation of the Church by-laws.

Complaint, ¶¶ 65-74.  The improper admission of these individuals, many of whom were

MacKenzie and Kennedy's friends and family members, deprived Plaintiff George Chapin of his

voting power by diluting his vote to the point where it was essentially ineffective.  Complaint,

¶¶ 64-73; Complaint, Exs. F & G.  Therefore, Chapin has standing to assert the claim for breach

of the by-laws as to membership because he has a private interest that is distinct from the interest

of the public.  See Lopez, 384 Mass. at 168; Jessie, 372 Mass. at 303, 305; Mitchell, 355 Mass.

at 280, 283.[11]

### C.      The First Amendment Does Not Preclude Adjudication of the Breach of By-Law Claim.

Defendants claim that the First Amendment prohibits the Court from adjudicating the

breach of by-law claim as to membership.  Def.'s Mot. To Dismiss at 17.  However, it is well

settled law in Massachusetts that "[c]ivil courts may permissibly decide church property disputes

so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of

---

[10] See also Jesse v. Boynton, 372 Mass. 293, 303 (1977) (members of a charitable corporation who alleged that the corporation's officers, in violation of their fiduciary duties, had induced members to vote in favor of a by-law amendment eliminating their voting rights stated a cause of action sufficient to withstand a motion to dismiss); Mitchell v. Albanian Orthodox Diocese in America, Inc., 355 Mass. at 279, 282 (members of church could pursue claim alleging deprivation of right to vote where defendants had engaged in a "conspiracy to perpetuate themselves in office").

[11] The Association, by way of its by-laws, had the right to determine if Church memberships were valid.  Complaint, ¶¶ 96-98.  Accordingly, it also has standing to pursue a claim as to the validity of memberships and the effectiveness of votes.

worship or the tenets of faith." Weaver v. Wood, No. 937320, 1994 WL 879566, at *4 (Mass.

Super. Sept. 14, 1994) (citing Jones v. Wolf, 443 U.S. 595, 602 (1979)) ("judicial intervention is

permissible where the dispute involves the interpretation of by-laws as they constitute a contract

between the church and its members"). Thus, courts may resolve disputes which center on a

breach of the church by-laws, not any church doctrine. Id.; see also Mitchell v. Albanian

Orthodox Diocese in America, Inc., 355 Mass. at 282 (holding that the Court had jurisdiction to

interpret the by-laws of the church regarding the process for appointment of a Bishop because

the issue was one of contract law and not of church law).

     Here the dispute does not concern matters of religious doctrine and faith. Rather, the

breach of by-law claim as to membership merely requires the court to interpret membership

requirements as set out in the by-laws and determine whether the Church met those requirements

in its admission of new members. Complaint, ¶¶ 71-73. Thus, the Court can resolve this issue

by relying on objective, well-established "neutral principles of law." See Weaver, 1994 WL

879566, at *6 (court could address ultra vires conduct of defendants in their dealings with church

property because "neutral principles of law" could be applied to the dispute because the "by-law

does not contain any reference to religious doctrine, policy and practice.").[12] Consequently, this

Court may adjudicate the Plaintiffs' breach of by-law claim as to membership.[13]

---

[12] See also Antioch Temple, Inc. v. Parekh, 422 N.E.2d 1337, 1345 (Mass. 1981) ("Under the 'neutral principles of law' analysis, as long as a State court's resolution of a church property dispute involves no inquiry into religious doctrine, the court may examine such sources as . . . the constitutions and by-laws of the religious organizations involved, especially in so far as they pertain to the ownership and control of church property . . . ."); Lily of the Valley Baptist Church, Inc. v. Josey, No. 99-P-576, 2002 WL 31445129, at *1 (Mass. App. Ct. Oct. 30, 2002) (holding that the court could resolve dispute over church by-laws).
[13] Courts considering this issue either decide it under the "neutral principles of law" approach or they look to the structure of the church, namely whether its is "hierarchical" or "congregational." A congregational church is one that is self-governing. Antioch Temple, Inc. v. Parekh, 422 N.E.2d 1337, 1341 (Mass. 1981). Courts may resolve disputes as to congregational churches. Id. Thus, even if this Court decides not to apply the neutral principles of law approach, the Court may address the present disputes because the Church is congregational.

**D.    The Alleged Role of the Attorney General Does Not Suggest That This Matter Be Dismissed.**

Defendants contend that the role of the Attorney General as to public charities and his initiation of a demand for civil relief mandate the dismissal of the action against the Church and Bostonview.  This argument fails for several reasons.  As noted above, the authority of the Attorney General applies only to injury to the public.  See supra pp. 7-11.  The Attorney General has no right to interfere in litigation by plaintiffs pursuing damages based on private rights.  As noted above, the Denomination and Mr. Chapin are pursuing such claims.  Id.

In addition, requiring the Plaintiffs to pursue two related lawsuits in state court and federal does not serve the interests of judicial economy and fairness.  The same interests will be addressed in both courts.  Accordingly, this Court should retain supplemental jurisdiction over the claims involved.

**E.    Principles Concerning Supplementary Jurisdiction Do Not Suggest That This Matter Should be Dismissed.**

The Defendants also wrongly contend that the Court should decline to exercise supplemental jurisdiction in this case pursuant to 28 U.S.C. § 1367, on the grounds that "the state law claims against the Church and Bostonview predominate over the RICO claims against the Individual Defendants; the state law claims implicate important and comprehensive state law issues; and the claims in this case concern a public charity, over which the Attorney General, not the Plaintiffs, has exclusive responsibility to regulate and enforce proper conduct."  Mot. To Dismiss at p. 9.

Principles concerning supplementary jurisdiction are also of no assistance to the Defendants.  28 U.S.C. § 1367(a) provides that "the district courts shall have supplemental jurisdiction over all . . . claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United

States Constitution." Thus, federal courts may exercise supplemental jurisdiction over a state law claim if it is joined with a federal law claim and the claims "derive from a common nucleus of operative fact" and the plaintiff would "ordinarily be expected to try them both in one judicial proceeding." Pejepscot Indus. Park, Inc. v. Maine Cent. R.R. Co., 215 F.3d 195, 206 (1st Cir. 2000) (quoting United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966)).

A district court may, but is not required to, decline to exercise supplemental jurisdiction only if (1) the claim raises a novel or complex issue of state law; (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction; (3) the district court has dismissed all claims over which it had original jurisdiction; (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction. 28 U.S.C. § 1367(c). When determining whether to exercise supplemental jurisdiction over state law claims, a district court must analyze a number of factors, including "judicial economy, convenience, fairness, and comity." Newman v. Burgin, 930 F.2d 955, 963 (1st Cir. 1991).

The present case offers claims that arise from the same nucleus of operative fact. The activities of MacKenzie and Kennedy relevant to the RICO claim are also at issue in the Count by Chapin contending that his voting right has been compromised. Such acts include those taken to nullify the votes of Church Members through the admission of new members and the use of extortion to obtain votes from elderly members.

The Church is also a necessary party to the derivative RICO claims alleged by Chapin against MacKenzie and Kennedy. The RICO claims will also address the same actions underlying the State law claims alleged by Plaintiffs. For example, MacKenzie and Kennedy's commission of predicate acts is relevant to whether they breached fiduciary duties, committed fraud and violated chapter 93A. Damages owed by MacKenzie and Kennedy as to the RICO

claim must also be paid directly to the Church.  Thus, the claims arise out of the same nucleus of operative fact.

Plaintiffs' claims also do not raise any uncertain, novel or complex issues of state law.  At its core, this case is about a fraudulent scheme and pattern of racketeering activity employed by the Defendants to extort funds and gain control of the $30 million apartment house owned by the Church.  Thus, this case presents issues ordinarily addressed by federal courts.

The Defendants' contention that the Court should not exercise supplemental jurisdiction because the state law claims predominate over the RICO claims is also without merit.  As noted above, the RICO, Chapter 93A and Breach of Fiduciary Duty claims are based on the same nucleus of operative fact.  The RICO counts are based on the Defendants' racketeering activity and use of extortion to gain control of the church and its assets.  The 93A claim is based on the Defendants' unfair and deceptive acts, made possible through their tactics of extortion and coercion.  The Breach of Fiduciary Duty claim is based in part on the Defendants' ability to gain control of the trustees and directors of both boards through extortion and coercion and their misappropriation of assets.  Thus, the inclusion of the state law claims does not mandate dismissal of this case.[14]

---

[14] Much of the Defendants' argument that the state law claims predominate is based on Brayall.  Brayall, however, involved facts that are readily distinguishable from the present case.  Brayall involved a lawsuit filed by distributors of Tupperware products alleging that the defendant company had committed numerous misrepresentations and unfair and deceptive trade practices in order to induce the plaintiffs to enter into a business transaction.  Brayall, 1988 WL 72766 at *1.  The plaintiffs filed the case in state court and it was subsequently removed by the defendants to federal court.  Id.  The plaintiffs then filed an amended complaint containing seven state law counts and one RICO claim.  Of note, the court stated that there would be some overlap in evidence pertaining to the RICO and 93A claims.  Id. at 4.  The court was persuaded, however, that because of the numerous additional state law claims at issue – breach of fiduciary duty, breach of contract, breach of implied covenant of good faith and fair dealing, intentional interference with contractual and advantageous relations, and intentional infliction of emotional distress – it was a classic state law case.  Id. at 5.  The same cannot be said of the present case.  The Plaintiffs' allegations are closely tied to the federal policy behind RICO, namely, combating organized crime.  Id. at 6.  Moreover, this case does not involve uncertain issues of state law, as the alleged conduct clearly rises to a "level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce."  Id.

**F.    Count IV Should Not Be Dismissed Because the Complaint States a Claim for Breach of the Church's By-Laws.**

When the Church disaffiliated itself from the Denomination its by-laws provided:

In the event that the religious body known as the Boston Society of the New Jerusalem, Inc. shall cease to exist, all funds and holdings shall be transferred to the General Convention of the New Jerusalem in the United States of America.

These assets shall be held in escrow for the establishment of another General Convention of the New Jerusalem (Swedenborgian) Church within the City of Boston, Massachusetts.

See Complaint, Ex. C (emphasis added).

The Defendants have argued there has been no cessation of the Church's existence sufficient to trigger the application of Article X, Section 3 of the By-Laws.  To accept the Defendants' position, however, this Court would have to adopt the Defendants' overly narrow construction of the By-Laws and thereby ignore the long-standing legal principle that the plaintiff on a Rule 12(b)(6) motion to dismiss is entitled to all favorable inferences. Accordingly, and as set forth in greater detail below, the Court should reject the Defendants' argument and permit Count IV to remain in the litigation.

**1.    The Defendants Have Ignored The Standards The Court Must Apply In Evaluating Whether Count IV States A Claim Upon Which Relief Can Be Granted.**

By premising its argument on a narrow construction of the By-Laws favorable to their position, the Defendants ignore the standards governing a motion to dismiss.  In evaluating a Mass. R. Civ. P. Rule 12(b)(6) motion to dismiss, "[t]he allegations in the complaint will be treated as true, and the plaintiff is entitled to all favorable inferences."  General Motors Acceptance Corp. v. Abington Cas. Ins. Co., 413 Mass. 583, 584 (1992).  A motion to dismiss a complaint for failure to state a cognizable claim should not be allowed unless it appears certain that the complaining party is not entitled to relief under *any* set of facts which could be proved in

support of its claim. <u>Berish v. Bornstein</u>, 437 Mass. 252, 267 (2002) (emphasis added). In parsing the complaint, a plaintiff bears "a relatively light burden," <u>Warner-Lambert Co. v. Execuquest Corp.</u>, 427 Mass. 46, 47 (1998), and "has to be given the benefit of the doubt." <u>Wrightson v. Spaulding</u>, 20 Mass.App.Ct. 70, 72 (1985) (doubts or misgivings of a claim's provability or even credibility are not a proper basis for a Rule 12(b)(6) dismissal). In short, to survive, a complaint need only outline "the bare silhouette" of a claim. <u>Fabiano v. Boston Redevelopment Authority</u>, 49 Mass. App. Ct. 66, 71 (2000). Under these standards, the Defendants' motion to dismiss Count IV must be denied.

**2.    General Contract Interpretation Principles Suggest That The Defendants' Breached the By-Laws.**

The Church suggests that the By-Laws at issue represent a contract between the Church and its members. <u>Jessie v. Boynton</u>, 372 Mass. 293, 303 (1977); <u>Mitchell v. Albanian Orthodox Diocese in America, Inc.</u>, 355 Mass. 278, 279 (1969). As such, general principles of contract interpretation should be applied to interpret the By-Laws. <u>ER Holdings Inc. v. Norton Co.</u>, 735 F. Supp. 1094, 1097 (D. Mass. 1990). Under Massachusetts law, the proper interpretation of a contract is one which appears to be in accord with justice, common sense and the probable intention of the parties. <u>Stop & Shop, Inc. v. Ganem</u>, 347 Mass. 697, 701 (1964). The intent of the parties to a contract must be gathered from a fair construction of the contract as a whole, and not by special emphasis upon any one part. <u>Ucello v. Cosentino</u>, 354 Mass. 48, 51 (1968). If a court finds the contract language to be unambiguous, the court should construct the contract according to its plain terms. <u>Bank v. IBM Corp.</u>, 145 F.3d 420, 424 (1st Cir. 1998).

Applying these time-honored maxims of contract interpretation to the By-Laws at issue, Article X, Section 3 encompasses the disaffiliation between the Church and the Denomination orchestrated by the Defendants. The provision specifically provides that the Denomination will

hold the Church's assets only until a new church which is affiliated with the Denomination is formed. Thus, the provision contemplates that the Church and any future church must be affiliated with the Denomination. Accordingly, the provision is applicable where the Church is no longer affiliated with the Denomination.

Furthermore, the term "dissolution," which acts as the title to the by-law provision, has been defined as "the dissolving of a tie or connection," and its root term "dissolve" has been defined as "to bring to an end by . . . causing the disassociation of." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 657 (1961). There can be no question that Defendant MacKenzie's successful orchestrating of the Church's disaffiliation from the General Convention and the Massachusetts Association resulted in the Church's "disassociation" from "ties and connections" stretching back more than one and a half centuries. Under the plain language of the By-Laws, then, the term "dissolution" encompasses the disaffiliation of the Church from the Denomination, triggering application of Article X, Section 3.[15] By failing to place Church assets into escrow upon disaffiliation, the Defendants breached this Dissolution provision. Accordingly, Count IV states a contract claim upon which relief can be granted.

Common sense supports such a construction. As a result of their efforts, the Defendants have caused, for all intents and purposes, the "religious body known as the Boston Society of the New Jerusalem" to "cease to exist." Article X, Section 3. That religious body received its affiliation with the General Convention of the New Jerusalem in 1817, and became affiliated with the Massachusetts Association of New Jerusalem Churches upon the formation of that

---

[15] The Defendants construe Article X, Section 3 of the By-Laws far too narrowly, relying on the provision's "Dissolution" heading in suggesting that it relates solely to the Massachusetts statute for the dissolution of charitable corporations. However, nowhere in the By-Laws is M.G.L. c. 180, § 11A of the Massachusetts General Laws even mentioned, let alone incorporated by reference. Nor have the Defendants identified any language in the By-Laws or any applicable principle of law in support of their assumption that the "Dissolution" heading represents a term of art referring solely to M.G.L. c. 180, § 11A. In the absence of any factual or legal support for their narrow construction of Article X, Section 3, and in light of the Plaintiffs' entitlement to all favorable inferences, the Defendants' interpretation of the provision must be rejected.

Association in 1835.  These relationships, fundamental to the Church's creation and existence, are embodied in the Church's By-Laws at Article III – "Affiliations," just below Article II – "Purpose and Responsibility."  It is self-evident, then, that the By-Laws contemplated a continuing affiliation between the Church and the Denomination and that an affiliated church is what the wider congregation had always wanted.  Put simply, and as the Plaintiff will demonstrate at trial, disaffiliation was far more than a "mere separation" from the Denomination, as the Defendants suggest in their Memorandum.  To the contrary, the new Church leadership essentially has caused the Boston Society of the New Jerusalem, as it had existed for over 185 years, to cease to exist.  At the very least, the Denomination must be afforded the opportunity to make such a showing at trial.

> **3.    To the Extent the Court Finds Article X, Section 3 Ambiguous, Claim IV Must Survive the Defendants' Motion and Be Resolved At Trial.**

If this Court deems the terms "Dissolution" and "cease to exist," as they are used in Article X, Section 3 of the By-Laws, to be ambiguous, the instant motion does not represent the appropriate moment for resolving the ambiguity.  If an inquiring court concludes that a contract ambiguity exists, ultimate resolution of it will turn on the parties' intent.  Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 178 (1st Cir. 1995).  If contract ambiguity requires inquiry into the parties' intent, extrinsic facts, together with the reasonable inferences extractable therefrom, are superimposed on the ambiguous words to reveal the parties' discerned intent.  Id. To establish the intent of the parties, all circumstances of the parties leading to the contract's execution may be shown for the purpose of elucidating the ambiguous terms.  Robert Industries, Inc. v. Spence, 362 Mass. 751, 753-754 (1973).

When "the plain meaning of a contract phrase does not spring unambiguously from the page or from the context, its proper direction becomes one for the factfinder, who must ferret out

the intent of the parties." <u>RCI Northeast Servs. Div. v. Boston Edison Co.</u>, 822 F.2d 199, 202

(1st Cir. 1987). Resolution of contract ambiguity, therefore, requires an evidentiary proceeding

targeted toward clarifying the parties' intent with respect to the ambiguous terms. The instant

motion does not give rise to such a proceeding. Accordingly, to the extent this Court finds the

terms "Dissolution" and "cease to exist" as used in Article X, Section 3 ambiguous, the Plaintiff

is entitled to the most favorable inference, and the Defendants' motion should be denied.

<u>**CONCLUSION**</u>

For the reasons set forth above, Defendants' Motion to Dismiss should be denied.

THE GENERAL CONVENTION OF THE NEW JERUSALEM IN THE UNITED STATES OF AMERICA, INC., THE MASSACHUSETTS ASSOCIATION OF THE NEW JERUSALEM (SWEDENBORGIAN) and GEORGE CHAPIN,

By their attorneys,

**HOLLAND & KNIGHT LLP**

/s/ Christopher J. Trombetta _____
Geoffrey E. Hobart (BBO No. 547499)
Christopher J. Trombetta (BBO No. 556923)
10 St. James Avenue
Boston, MA  02116
(617) 523-2700

Dated:  April 5, 2004

# **EXHIBIT A**

# Boston Sunday Globe

MARCH 14, 2004

CHURCH, Page A22

*'A lot of these people can't even spell Swedenborgian, let alone know what it means.'*

GEORGE CHAPIN, *church stalwart*

# A tiny church, a pot of gold, an ex-con spark a bitter feud

### By Kevin Cullen
GLOBE STAFF

There are many places you would expect to find a South Boston hoodlum like Eddie MacKenzie on a Sunday morning, but the pulpit of the Swedenborgian Church on Beacon Hill is not one of them.

Still, there he was one recent Sunday, standing before the congregation, championing the right of this 186-year-old church to secede from the national organization of this tiny Christian sect.

"There is a renewed spirit of freedom and independence in our church," MacKenzie told the 50 or so worshipers. "We need to truly believe we are God's disciples. . . . We are filled with a revolutionary energy and spirit."

As if on cue, the choir broke into "Yankee Doodle Dandy."

Not that everyone in the pews felt like singing along. George Chapin, a church stalwart for half a century, remembers watching MacKenzie, dumbfounded, and thinking, *"What the hell is going on*

*here?"*

Edward J. MacKenzie Jr. is a man of parts — many parts.

He is the author of a maim-and-tell memoir about his years as a legbreaker for South Boston gangland leader Whitey Bulger.

He has been, as he describes himself, a man almost irresistibly drawn to cons and scams. He recently admitted to filing phony worker's compensation claims and is awaiting trial on charges of swindling $200,000 from an elderly woman. And he faces charges in another court that he threatened to kill his ex-wife by chaining a cinderblock to her leg and throwing her off a bridge.

He is, in short, a busy man.

But he finds time for church. Indeed, within months of joining, be became part of a new leadership circle that is shaking the rafters at Boston's Swedenborgian church — and raising doubts among some about how the church's wealth is being spent.



GLOBE STAFF PHOTO/JOHN TLUMACKI

Eddie MacKenzie (left) with the Rev. G. Steven Ellis at the New Jerusalem Church on Bowdoin Street.

# On Beacon Hill, a church divided

► CHURCH
Continued from Page A1

Upfront about his prolific rap sheet, MacKenzie has won an ally in the church's longtime pastor, the Rev. G. Steven Ellis, who sees him as a man who turned his back on crime, a sinner seeking spiritual sanctuary. Ellis, a Bible scholar who has been pastor of the Boston church for 22 years, has sided with MacKenzie against church elders, who are skeptical of Mac-Kenzie's conversion and worried about his motives.

Ellis did more than take MacKenzie's side. He nominated him for church treasurer, pushing aside his own mother-in-law.

And so in September, MacKenzie took office. It seemed like a very auspicious move.

For while the Bowdoin Street church is poor in numbers, it is rich by any other measure — and may soon become much richer. The church owns an 18-story apartment building above the chapel that churns out more than $1 million a year in clear profit, according to an October audit by the church's accountant. And a plan has been floated in Boston real estate circles to convert the building to condominiums, a move that the church estimates could yield as much as $75 million.

The new leaders say they are trying to reenergize a moribund institution, to recruit new members and more aggressively manage church assets. There are already indications, beyond the possible conversion of the building, of a more freewheeling approach to church finances.

The church trustees recently voted to make a $350,000 loan to one of the new church leaders — a loan authorized but apparently not used. A lump sum of $850,000 has been transferred to a real estate company in which MacKenzie and another church leader were founding officers. And church bylaws have been changed to make it easier to sell church property and to remove a ban on church leaders' profiting from such sales.

They are the kinds of changes that deeply unsettle some longtime church members, changes that led the national church to file a civil racketeering lawsuit against the new leadership March 1 in US District Court.

The suit claims the new leaders "have utilized a pattern of racketeering activity to wrongfully take control of a 185-year-old church to obtain dominion over its

$30 million apartment house, which now generates more than $1.3 million in annual income." The suit seeks to void the memberships of more than 40 people who joined the church in the last two years, and to transfer the church's assets to the national organization.

"MacKenzie is a criminal," the suit alleges. "He has infiltrated the Church only to access its resources for his own personal benefit."

Chapin, one of the plaintiffs, said many of the new members were rushed into the church, without proper training in Swedenborgianism, to rubberstamp the self-serving agenda of the new leadership.

"A lot of these people can't even spell Swedenborgian, let alone know what it means," he said.

Christine Laitner, the vice president of the national Swedenborgian organization, says her group authorized the Boston law firm of Holland & Knight to file the suit "to protect not just the assets of the Boston church, but the history and the legacy and the purpose behind the establishment of this church."

"What's happened in Boston is a shame," she said.

The Boston church's lawyer, Gerald P. Hendrick of Edwards & Angell, calls the lawsuit meritless, while MacKenzie and other church leaders dismiss it as sour grapes.

"Some of these older members appear to have an ax to grind," Hendrick said.

Word that a man of MacKenzie's reputation would have a hand in deciding how the church spends its wealth has also filtered to the office of Attorney General Thomas F. Reilly. And almost as soon as Reilly's investigators began snooping around the church last November, demanding its financial records, MacKenzie stepped down as treasurer. He is now the church's chief of operations.

With his hangdog eyes and what-me-worry disposition, 45-year-old Eddie Mac-Kenzie seems serene as he contemplates the maelstrom he helped create. He says he'll beat the rap in his upcoming trials. His accusers are lying, he says, and besides, he's got religion. When he was a young thug, selling coke on street corners and roughing up rivals, his horizon stretched no farther than Winter Hill in Somerville, where Irish plug-ugliest plotted mayhem and formed a gang named after the hill, a gang whose boss was Whitey Bulger. Now MacKenzie sits in a church on Beacon Hill, a new man.



**A QUESTIONED LEADER**  Former South Boston mob foot soldier Eddie MacKenzie says he was first attracted to Beacon Hill's Swedenborgian church when a friend told him that it paid college tuition for members' children. Now, as a church leader, he insists he has nothing but good intentions for the institution, although he adds that he understands how some people would think ill of him. "For some people, I'm always going to be a scumbag," he says.

"I love this church," he says. "I've kind of found my niche."

## The Church on the Hill

Boston's Swedenborgian church, known legally as the Boston Society of the New Jerusalem, known colloquially as the Church on the Hill, is named for the 18th-century Swedish scientist and philosopher Emanuel Swedenborg, who believed that Jesus Christ has already made a second coming, in spirit rather than in person.

Swedenborg's unorthodox analysis of the Bible was denounced as heresy by some mainstream Christians, but it quickly won adherents. Among the tenets of Swedenborgianism is that believers, not God, decide their own afterlife.

"The church is within man," he wrote. Swedenborg died in 1772, at the age of 84, and the first group of Swedenborgians organized themselves in London 15 years later. By the early 1800s, churches were sprouting up in the United States.

The church spread rapidly in an era of spiritual and intellectual awakening. It was at the forefront of what today would be called progressive thinking. In the mid-19th century, the church advocated for coeducation. In the 1920s, one of its most prominent members, Helen Keller, led the fight for rights for the disabled. Today, the movement is greatly diminished, though there are affiliated churches in more than 30 countries. There are five Swedenborgian congregations in Massachusetts. Officials at the national office in Newton say there are about 1,500 active Swedenborgians nationwide, down from 2,600 a decade ago.

The Boston congregation, founded in 1818 by a group of Harvard students and

alumni, is the fourth oldest, and became what Marguerite Block, a church historian, called "the real center of the New Church" in America. New England has long occupied a special place in the church's history, in part because some of the region's leading intellectuals, from Ralph Waldo Emerson to Henry James, were influenced by Swedenborg's writings. Among the region's most famous Swedenborgians were the poet Robert Frost and a Leominster native named John Chapman, better known as Johnny Appleseed.

The Swedenborgians' first church in Boston, a Gothic cathedral built in 1844 on Bowdoin Street, adjacent to the State House, had seating for more than 1,000. But as the years passed on, so did many of the Brahmins who made up much of the congregation. With numbers down and the oversize church crumbling, the congregation decided in 1966 to tear the edifice down and replace it with an apartment building that housed a small church. The ground-floor chapel has room for about 100; the 143 apartments above would yield, they hoped, sufficient income to sustain the local chapter of Swedenborg for generations to come.

And, as it had for generations, the church on Beacon Hill dispensed its version of Christianity and did its good works in relative obscurity. Whatever was left over from paying for upkeep of the apartment building was used to pay for college educations for members' children and, occasionally, a deserving charity case. But it has the means to do much more. With about 100 members, and a mortgage-free building that real estate appraisers say is worth at least $30 million, the church is surely, per capita, among the wealthiest to

be found.

## A time of turmoil

And so it was, almost two years ago, that Eddie MacKenzie arrived at the Boston church at a time of extraordinary economic opportunity. But it was also a time of unprecedented turmoil, a feud in the church's leading family, in fact.

Ellis, the pastor, had had a bitter falling out with his wife's parents, Bobby and Joan Buchanan, who for more than a decade had been officers in the church. Joan Buchanan was treasurer, and she was generally given high marks by the membership for managing its finances. But in recent years, Ellis and the Buchanans have clashed with increasing frequency over church matters. At the church's annual membership meeting last May, Ellis handed out a flier with the names of church officers he planned to vote for. His in-laws were not on the list, but Eddie MacKenzie was. Later, the Buchanans were expelled from the church.

The Buchanans declined to be interviewed by the Globe. But Ellis said they took their concerns to the church's state and national organizations, saying they worried about his mental stability.

Would any man of good judgment, they wondered, have so swiftly turned the church's leadership over to MacKenzie? Or to Thomas J. Kennedy, a former MBTA auditor who, while never accused of wrongdoing like MacKenzie, was one of MacKenzie's early supporters and became, within a year of joining, the church president?

Some longtime members, like Thomas Peebles, whose family has been in the church since its founding, were similarly distraught at the change in leadership and direction.

"Many of us," said Peebles, a physician and former head of the Harvard Community Health Plan, "are understandably distressed at the hostile takeover by a newly elected and closely knit group of friends and relatives, which include an admittedly criminal element among its leaders."

Last August, the national organization's Misconduct Determination Board took up the Buchanans' cause and sent Ellis a letter saying it was "very concerned about the physical, mental, and spiritual health of Steve Ellis." The board proposed appointing a consultant "from outside the Swedenborgian Church" who could work with Ellis in, among other things, "assuring fiscal propriety."

Ellis, whose three decades in Boston have done little to diminish a downhome drawl from his native Kentucky, looks something like Friar Tuck, with his beard and ample girth. But his demeanor took on a furious edge after he learned of his in-laws and the national and state associations had joined forces against him.

"My integrity and service to the

Church has been defamed," Ellis wrote in his letter of resignation to the national group. "I have been treated worse than a criminal."

At Ellis's prompting, and with MacKenzie's and Kennedy's active lobbying of church members, the church abruptly severed ties with the national organization to which it had been bound since its founding, and quit the state association with which it had been affiliated since 1835.

MacKenzie says the critics of the new church leadership badly miscalculated the membership's loyalty to Ellis.

"They attacked Steve's integrity when they should have attacked me and Tom Kennedy," MacKenzie said. "No one complained when I came into the church and was just serving food or cleaning up. Once they found out I was running for treasurer, I became a hegbreaker. It's OK to throw someone like me a bone, but not with any meat on it."

Liberated from the oversight of the national and state associations, Ellis, Kennedy, and MacKenzie set about insulating their church from what Ellis described in an interview as "outside enemies."

Under a new set of church bylaws drawn up in November, it became much easier, and much faster, for new members to join. Ellis was given complete discretion in deciding who would be confirmed — and how. Newcomers can now be admitted by a simple majority vote of existing church members; before, a two-thirds vote was required. Required doctrinal training, emphasizing Swedenborg's writings, was eliminated.

Goos, too, was a provision that any sale of church property be approved by two-thirds of members, and one that barred individuals from enriching themselves with church assets. A new provision calls for the expulsion of members deemed unworthy by a simple majority.

There is one other new mandate. Any changes to church property must now "be directed by a Director of Operations."

That would be Eddie MacKenzie.

He says he knows very well what his critics think: that he and a band of cronies are pocketing cash, spending it freely, squirreling it away in new accounts. It is baseless and insulting talk, he says.

"You can't take money here. There are systems in place. I couldn't steal money here even if I wanted to," he says, hesitating slightly before adding, "and I don't want to."

## 'He preys on people'

So how did the New Church and Mac-Kenzie, Swedenborg's and Southie's own, come together?

MacKenzie says he was first attracted to the church when a friend told him that one of its traditions was to pay college tu-

Continued on next page



**VALUABLE ASSET**  The church, known officially as the Boston Society of the New Jerusalem, sits beneath an 18-story apartment building on Bowdoin Street that churns out more than $1 million a year in profit. The new church board is considering selling the building.

Continued from preceding page

ition for members' children. But he says his goal now is to put the church's wealth to work for the disadvantaged, not himself. He said he is doing so well financially, between book sales and what he said is a soon-to-be-finalized movie deal, that he may not even need to ask the church to pay for the college educations of his five daughters.

MacKenzie says he has not read much of Swedenborg but had read enough to appreciate his "genius." He says it was Ellis's charismatic sermons that captured his imagination.

"It was more about him talking about Daniel Boone and Davy Crockett than Emanuel Swedenborg," he said of Ellis's proselytizing.

Ellis says his great-great-great-great-great-grandfather was a close friend of Boone's.

MacKenzie says he did not hide his past from Ellis or anyone else he met at the church.

Ellis bought 60 copies of his book and gave them to church members.

The book, "Street Soldier: My Life as an Enforcer for Whitey Bulger and the Boston Irish Mob," is an account of MacKenzie's disadvantaged childhood and life of crime. In it, he gleefully describes the pleasure he took in mayhem, including swallowing a finger he bit off an adversary. Some critics have called the book a wildly embellished tale of his role in Whitey's world.

MacKenzie's book is also frank about how hard he has found it to leave behind his criminal life.

"Crime is a way of life, an addiction," he writes.

In the final chapter, he observes: "Every day I face a choice: continue to change or fall back to the comfortable, darker ways of my predator side. Too often I retreat to scams and doing 'collections' for people. The money is good and easy, and the accompanying rush of adrenaline is probably close to what one gets in closing a legitimate business deal."

When asked whether she believes her former husband has changed his ways, Carla MacKenzie laughs ruefully before answering.

"There is no redemption in this story," she says. "I don't think Eddie could change even if he wanted to. . . . He preys on people with good hearts and takes them for what they are worth. I went through seven years of hell and therapy. I feel sorry for those people at that church."

In a criminal complaint for which Eddie MacKenzie is awaiting trial in Boston Municipal Court, Carla said that on Dec. 23, 2002, a month after he was accepted as a member of the church, Eddie called her after finding out she was a witness against him in a worker's compensation fraud case. According to the complaint, she told police that he "swore on his kids' life that he would kill her if she ever testified against him." Specifically, she said, he would have her "legs chained to a cinder-block and have her thrown over a bridge."

MacKenzie says that his former wife is lying, and that she has a pathological desire to destroy him.

Though he vigorously defends his honor in the pending cases, MacKenzie says

he understands why some people would think ill of him.

"For some people, I'm always going to be a scumbag," he says. "There's nothing I can do about that."

Ellis, for his part, sees MacKenzie as bringing just the sort of new blood the church needs. Unlike some of those now complaining about the new direction of the church, he said, MacKenzie has not missed a service since joining.

"The disgruntled people said: 'We need doctors and lawyers and professionals. We don't need bums.' Well, I found that under the bum stuff were some brilliant people," Ellis says.

MacKenzie also sees snobbery behind the opposition.

"There are about six or seven families who are complaining," he says. "This church was the best kept secret on Beacon Hill. These people were taking care of their families and their relatives, not the church. . . . We've opened up the church, and we're going to continue to open it up."

Certainly, the new regime has brought many new members in. Church records show that at least 45 of its 105 members joined the church over the past two years, 28 of those in just the past year. MacKenzie said he's brought in about 10 friends and relatives.

Ellis says that shows an open-door policy. Disgruntled members say the new regime stocked the pond with loyalists.

Ellis, meanwhile, says he is not troubled by MacKenzie's notorious past.

"Paul," the minister said, "was a murderer" before he became a saint.

Other Swedenborgians are more skeptical. The Rev. Lee Woofenden, pastor of a Swedenborgian church in Bridgewater, says he read MacKenzie's book and was disturbed.

"I'm a minister, and I believe in redemption," Woofenden says. "I believe people can reform. But I'm also a pragmatic person, and I don't believe that you take people who have been convicted of wrongdoing and put them in charge of your church. I think the Boston church has acted irresponsibly by putting a convicted felon in such a position of authority."

## Financial maneuvers

Whether it is bold leadership, or, as the lawsuit alleges, some sort of self-serving conspiracy, the new power brokers at the church have been hard at work.

Late last year, John B. Burke, who replaced MacKenzie as treasurer Dec. 6, just a month after becoming a church member, began approaching property developers, asking if they were interested in converting the apartment building into condominiums.

Burke is the former co-owner of a South Boston nightclub who now works at a real estate firm on Cape Cod. In the early 1990s, he unsuccessfully tried to open an upscale strip club in the Combat Zone.

A Boston College graduate, he was an enthusiastic convert to Swedenborgianism. Upon being accepted as a member of the church in November he asked to be baptized in the Charles River.

And he is bringing his business smarts to bear on church finances. One property developer who saw the church's proposal Burke was circulating among potential investors, and who asked not to be identified, told the Globe, "They are looking for the capital and the ability to convert it."

The developer said the church's proposal estimated that, depending on the

quality of the converted condos, the project could fetch up to $75 million — proceeds that, if properly invested, the church could live off of perpetually. Former leaders of the church said they, too, had considered selling off the building but decided that funding the church with steady rents was a better option than cashing out.

Filtrip is the secretary of state's office, meanwhile, show that MacKenzie and Burke formed a private real estate company, Harborview Real Estate Corp., on Nov. 12. It was, as it happens, one day before the attorney general wrote to the church, demanding its records.

Burke says the idea of converting the apartments to condos is just one of several options the new leadership is considering. "These are very informal discussions," he says.

Burke says that Harborview is owned by the church, that it was created as "an investment vehicle" in which church leaders could have access to church funds that were previously tied up with the company that manages the apartment building. He says $850,000 was deposited into Harborview, with "a lot of money in annuities," and that the new corporation provides "normal diversified" flexibility.

Hendrick, the church's lawyer, says MacKenzie was recently removed as an officer of Harborview, which he described as being wholly owned by Bostonview, the corporation that owns the apartment building, which is wholly owned by the church.

If Harborview was created legally, it was also created quietly. Several church members told the Globe they've never heard of it.

The Globe obtained an internal church document showing that church trustees and directors on Nov. 12 authorized Kennedy to borrow $350,000 from the church to buy a $423,500 home in Plainville. Kennedy said he subsequently turned down the loan.

"I declined it because of everything that was going on," he says. "The timing was wrong."

John Perry, who was baptized in the Boston church in 1929 and who was voted off the board of trustees last year, says the sudden, wholesale change in leadership,

and the moving of large sums of money, was rash.

"It makes no sense, but it makes cents, as in dollars and cents," says Perry, who is suspicious of the new leaders.

## The future

The attorney general is looking over their shoulder. Their erstwhile co-religionists have sued them. But the new leaders say they are undaunted as they reconfigure their obscure church into what they hope is a bigger presence in the city.

On Feb. 8, about 50 people gathered at the church for the 316th birthday of Emanuel Swedenborg. They listened as a Croatian minister for a different Swedenborg sect described how when he took over a church in Pennsylvania years ago, the congregation was fighting among itself. The older members thought they had the right to dictate to the younger ones. Sitting in a chair behind the visiting preacher, Steve Ellis closed his eyes and nodded.

"Praise God," Ellis said.

After the service, the congregation, many of them elderly, a few of them children, moved upstairs and took their seats on long tables with paper tablecloths and plastic cups of juice and soda to watch a play about Swedenborg's correspondence with the Queen of Sweden. Two actors in period costumes traded bon mots, a performance that was greeted with a mixture of smiles and seeming bewilderment from the audience.

"Most of these people are poor," Eddie MacKenzie said, surveying the room from the back, his arms folded.

He says these people are getting better food, better treatment, more respect, than they did under the old regime. There are more field trips. He's started a senior luncheon.

MacKenzie got, phase, big plans. He envisions the church putting on more theatrical performances for a wider public. He likes the idea of the church sponsoring youth athletic teams.

"Why not a team from Southie and a team from Roxbury, wearing uniforms with the church's name on them?" he asks.

All this costs money, but as Eddie MacKenzie says, "We've got the money."





**'IT MAKES NO SENSE'** John Perry (with his wife, Anne), a lifelong member of the church who was voted off its board last year, says the sudden change in leadership was rash. "It makes no sense, but it makes cents, as in dollars and cents," he says.

## History of the church

**1688** — Emanuel Swedenborg born in Stockholm, Sweden.

**1745** — Swedenborg says God appeared to him and told him a human was needed to serve as the means by which God would further reveal himself to mankind. Thus began Swedenborg's spiritual life.

**1749** — Swedenborg publishes his first theological work, anonymously, called "Heavenly Secrets."

**1772** — Swedenborg dies.

**1787** — Fifteen years after Swedenborg's death, a group of 12 followers in London form the Church of the New Jerusalem based on his theological works.

**1817** — The first New Jerusalem church in the United States is founded in Pennsylvania. It becomes the Swedenborgian Church of North America.

**1818** — A Boston congregation of the church is founded by a group of Harvard University students and alumni. It becomes the fourth American congregation.

**1844** — The Boston congregation builds its first major church, on Bowdoin Street, atop Beacon Hill, with seating for 1,000.

**1966** — With membership dwindling, the Bowdoin Street church is torn down and replaced by an apartment building over a smaller chapel with seating for 100.

The interior and exterior of the Bowdoin Street church, before it was torn down in 1966 and replaced with a smaller chapel and an apartment building.